**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEPHANIE SUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 cv 4541 |
| v. | ) | |
| | ) | |
| STEPHEN CALK and THE FEDERAL | ) | Judge Joan H. Lefkow |
| SAVINGS BANK, | ) | |
| | ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

To:     John D. Galarnyk
        Andrew J. Cuniff
        John Romanucci

        PLEASE TAKE NOTICE that, on April 30, 2021, the attached Defendants' Memorandum of Law in Support of Their Summary Judgment Motion was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division.

                                        **STEPHEN CALK and THE FEDERAL**
                                        **SAVINGS BANK**


                                        By____/s/  Daniel S. Hefter_____
                                             One of Their Attorneys

Daniel S Hefter
**HEFTER LAW, LTD.**
22 W. Washington
Suite 1500
Chicago, IL 60603
(312) 264-6565
dhefter@hefter-law.com


Dated: April 30, 2021

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEPHANIE SUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 cv 4541 |
| v. | ) | |
| | ) | |
| STEPHEN CALK and THE FEDERAL | ) | Judge Joan H. Lefkow |
| SAVINGS BANK, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**SUMMARY JUDGMENT MOTION**

**INTRODUCTION**

The plaintiff, Stephanie Suttle ("Suttle), borrowed $417,000 from defendant The Federal

Savings Bank ("TFSB") to purchase her ex-husband's interest in their former marital home. (First

Amended Complaint, Doc. #17, pp. 2-5.) She claims that she borrowed the money based upon a

knowingly false representation/promise by TFSB's then Chairman and CEO, defendant Stephen Calk

("Calk"), about the term and interest rate of the loan she would receive. Specifically, she alleges that

Calk represented/promised that the loan would be a 30-year home mortgage loan at the normal

interest rate for such loans and that, instead, the loan documents (which she alleges were "impossible

for her to understand"), provided for a one-year loan at a much higher interest rate. (Id., p. 1, ¶33,

and ¶36.) Based upon those allegations, she has sued TFSB and Calk for common law fraud,

violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and promissory

estoppel. (Id., Counts III, IV, and V.) She also alleges that she was entitled to rescind the loan

pursuant to the Truth in Lending Act, 15 U.S.C.A. § 1601 *et seq.*("TILA"), and TILA's

implementing regulation, Regulation Z, 13 C.F.R. Pt. 226. (Id., Counts I and II.) She alleges that

she attempted to rescind the loan and that TFSB wrongfully failed to rescind it in violation of TILA and Regulation Z. (Id.) TFSB counterclaimed for amounts due on the loan. (Doc. #37, pp. 22-24.) As demonstrated below, there is no genuine issue of material fact and, as a matter of law, the defendants are entitled to judgment in their favor on the plaintiff's claims and TFSB is entitled to judgment in its favor on its counterclaim.

**ARGUMENT**

**I.**     **THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS III, IV, AND V BECAUSE THERE IS NO EVIDENCE THAT THE ALLEGED MISREPRESENTATION/PROMISE WAS MADE; ALL OF THE EVIDENCE IS TO THE CONTRARY**

The loan documents Suttle signed were for a one-year loan at an adjustable interest rate, with a minimum rate of 7.25%, which is the rate that prevailed during the entire one-year term of the loan. (Defendants Statement of Material Facts as to Which There Is No Genuine Issue (hereinafter "Fact Statement"), ¶1.) Fraud (whether common law or statutory) requires a knowingly false representation of a material fact, and promissory estoppel requires a promise. *Miller v. William Chevrolet/GEO, Inc*., 326 Ill. App. 3d 642, 648, 762 N.E.2d 1, 7 (2001), *as modified on denial of reh'g* (Nov. 27, 2001); *Sass v. Andrew*, 152 Md. App. 406, 429, 832 A.2d 247, 260 (Md. App. 2003); *Avon Hardware Co. v. Ace Hardware Corp*., 2013 IL App (1st) 130750, ¶ 23, 998 N.E.2d 1281, 1290; *Javitt v. Cunningham Contracting, Inc*., 2016 WL 4493367, at *4 (Md. App. 2016); *Centro Medico Panamericano, Ltd v. Benefits Mgmt. Grp., Inc*., 2016 IL App (1st) 151081, ¶ 25, 61 N.E.3d 160, 165; *Oliveira v. Sugarman*, 226 Md. App. 524, 553, 130 A.3d 1085, 1103 (Md. App. 2016), *aff'd*, 451 Md. 208, 152 A.3d 728 (Md. 2017).[1] Counts III (for violation of the Illinois Consumer

_____

[1]The plaintiff's position is that Illinois law governs her state law claims, (Doc. #24, pp. 7-10), and the defendants' position is that Maryland law governs those claims. (Doc. #20, pp. 4-9;

Fraud and Deceptive Business Practices Act), IV (for common law fraud) and V (for promissory estoppel) of the Amended Complaint are all premised on an alleged statement by Calk that Suttle's loan would be a traditional 30-year mortgage loan at the standard interest rate for such loans. Her Amended Complaint alleges, "Instead of receiving the mortgage refinance she was promised, Calk and FSB switched from what they had promised and substituted with a one-year, high-interest bridge loan." (Doc. #17, ¶33.) But there is no evidence whatsoever that the representation/promise that Suttle's loan would be a 30-year mortgage loan at the normal interest rate for such loans was ever made; all of the evidence is to the contrary.

Suttle and her ex-husband were divorced on May 7, 2013. (Fact Statement, ¶2.) By the middle of 2016, the only unresolved financial issue between the ex-spouses was their marital home, which they jointly owned. (Fact Statement, ¶3.) The uncontradicted evidence is that Suttle had to get the funds for the purchase of her ex-husband's interest in the house to the trustee who had been appointed by the divorce court to sell it by October 28, 2016 or the house would be sold to her ex-husband or a third party. (Fact Statement, ¶4.) Suttle had begun working on a mortgage loan with Ramiro Moreno, a loan officer at NFM Lending, in August of 2016. (Fact Statement, ¶5.) But she was delinquent in filing her income tax returns and in paying her income taxes. (Fact Statement, ¶6.) In fact, as of the fall of 2016, she hadn't filed a federal or state income tax return for 2012, 2013,

---

Doc. #26, pp. 6-11.) However, on the points that are relevant to the defendants' summary judgment motion, Illinois law and Maryland law are the same. Therefore, the Court need not, in order to rule on the motion, engage in a choice of law analysis and decide which state's law governs. *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155, 879 N.E.2d 893, 898 (2007) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome").

2014, 2015, or 2016, and she owed the federal government and the State of Maryland thousands of dollars in back taxes, penalties, and interest. (Id.)[2]  A person who has failed to file income tax returns and pay income taxes is not eligible for a traditional mortgage loan until the returns are filed and the taxes are paid. (Fact Statement, ¶7.)  Moreno told Suttle that and repeatedly urged her to get her tax returns filed and her taxes paid so that her mortgage loan application with NFM could move forward.  On September 14, in an e-mail with "Tax Returns" in the subject line, Moreno said to Suttle:

> The answer was pretty short and sweet.  Get with the tax guy and see what you need to do to get them filed as soon as you can.

(Fact Statement, ¶8.)

On September 28, in an e-mail with "Following Up" in the subject line, he asked her:

> Any headway on the tax returns?  Have you at least talked to the accountant yet?

(Fact Statement, ¶9.)

Moreno testified at his deposition:

> Q.     ... And it says, "Any headway on the tax returns?  Have you at least talked to the accountant yet?"  What were you referring to there?
>
> A.     She had...several years where she had not filed taxes.
>
> ...
>
> Q.     ... In 2016 and 2017, was it the case that at NFM Lending, a home mortgage loan can't be made to a person who is not current in filing income tax returns and paying taxes?
>
> A.     We cannot close a loan until, yeah, the taxes are filed.

---

[2]As of the date on which her deposition was taken in this case, April 13, 2021, she still hadn't filed any of those tax returns, she also hadn't filed any for 2017, 2018, 2019, 2020, or 2021, and she owed over $400,000 in back taxes, penalties and interest. (Fact Statement, ¶6.)

Q.      And you've worked for other lenders besides NFM, correct?

A.      Yep.

Q.      How many others?

A.      Including NFM, four.

Q.      ... And was it the case that at each of your employers, a residential mortgage loan could not be made to a person who was not current in filing tax returns and paying taxes?

A.      ... [I]n my experience, in every mortgage company I've worked for, it's my understanding that tax returns need to be filed and current, the answer is yes.

(Moreno dep., Exhibit 5 to Fact Statement, pp. 6-8.)

Suttle had met Steve Calk in the late 1980s when she had lived in the Chicago area, and they became friends and dated briefly.  (Fact Statement, ¶10.)  They hadn't kept in contact between then and 2016, but on August 3, 2016, Suttle responded over Facebook to an ad for refinancing that The Federal Savings Bank's marketing department had posted on Calk's Facebook page saying, "Timely. Thanks!"  (Id.)  Calk responded, "Hi, Steph, if you are interested in refinancing give me a call on my cell at 312-961-7064.  it would be great to catch up."  (Id.)  She replied, "Will do."  (Id.)

At 4:34 p.m.[3] on August 8, Suttle called Calk and left him a voicemail.  (Fact Statement, ¶11.)  Calk returned the call at 10:04 p.m, and he and Suttle spoke for 43 minutes. (Id.)  They spoke again on August 15 and on August 16.  (Id.)  They then had no further contact until October 17.  (Id.)

By mid-October, it had become clear that Suttle would not be able to get her delinquent tax returns filed and pay her back taxes by the October 28 deadline.  (Fact Statement, ¶6.)  She wanted to buy the house, and would not be able to do so if she missed the deadline, and she needed

_____

[3]Suttle lives in Maryland and Calk lives in Chicago.  In order to make it easy to follow the sequence of events, all times in this brief are stated in Eastern Time.

approximately $398,000 to make the purchase. (Id., ¶4.) She could not get a traditional mortgage loan by October 28. (Fact Statement, ¶6 and ¶7.)

In the late morning and early afternoon of October 17, Suttle had three phone calls with her divorce lawyer, Howard Soypher ("Soypher"). (Fact Statement, ¶12.) They spoke for a total of 33 minutes. (Id.) At 1:41 that afternoon, she called Calk's number. (Fact Statement, ¶13.) She apparently did not reach Calk on that call because it lasted only one minute and at 1:43 p.m she texted Calk saying, ""Hey. I'm in a bind. Wondering if you may be able to help." (Id.) Calk responded, "Will call shortly." (Id.) Also at 1:43 p.m., Suttle called Soypher again. (Fact Statement, ¶14.) That call lasted three minutes, (id.), and then at 1:47 p.m. she sent Moreno an e-mail asking about the possibility of using her own funds for the purchase and subsequently getting a mortgage loan after filing her tax returns and paying her taxes, but Moreno asked her to call him to discuss that because there were a number of factors that could limit the amount of the loan she could get if she did that. (Fact Statement, ¶15.) And that type of loan (which is called a "cash out" loan), also carried with it a higher interest rate than a purchase money mortgage loan and a fee that is not charged for purchase money mortgage loans. (Fact Statement, ¶16.) If, on the other hand, she took out a bridge loan and used it to purchase her ex-husband's interest in the home, she could subsequently do what is called a "rate and term refinance" to refinance the entire amount of that loan with a traditional 30-year mortgage loan at the same interest rate and fees that apply to purchase money mortgage loans. (Fact Statement, ¶17.)

On October 18, Calk called Suttle and the two of them spoke on the phone for a total of 62 minutes ending at 12:02 p.m.. (Fact Statement, ¶18.) Suttle explained her predicament and Calk told Suttle that TFSB would make a bridge loan, but that it would have to be secured by cash deposited

by Suttle in TFSB in the full amount of the loan (in addition to the mortgage on the house which was necessary in order for Suttle to subsequently do a rate and term refinance as she said she planned to do). (Id.) At 12:05 p.m., Suttle called her divorce lawyer, Soypher. (Fact Statement, ¶19.) Later that afternoon, there were four calls between Suttle and Calk for a total of 18 minutes, and one more call from Suttle to her divorce lawyer. (Id.)

On the evening of October 20, Suttle spoke to her divorce lawyer for a total of 26 minutes and then, at 12:01 a.m. on October 21, she called Calk and the two of them spoke for 57 minutes. (Fact Statement, ¶20.) Later that morning, at 7:48 a.m., Suttle asked Calk via text message, "How much do I need to move over? $417K +/-?" (Fact Statement, ¶21.) Calk answered, "Yes mam". (Id.) They exchanged several more text messages that day regarding the transfer of money to The Federal Savings Bank to serve as collateral for the loan, and also exchanged three phone calls for a total of 9 minutes. (Id.) One of Suttle's text messages to Calk on October 21 said, "... Earlier today I sent 2 wires totaling just over $381,000.00. I am awaiting the settlement of additional funds so that I may wire the balance of the $417,000.00 needed no later than Wednesday, October 26. I wish to buy out my ex husband's share of my home, payoff the existing mortgage and then refinance the home at a much more advantageous rate. Thank you for your assistance in this matter. With much appreciation" (Id.)

On October 23, Suttle spoke to her divorce lawyer at 9:49 a.m. and then, at 11:39 a.m., texted Calk with information regarding securities she had just sold and said, "This will be settling on Wed. $417K may be fully funded then." (Fact Statement, ¶22.) On October 24, Suttle spoke with her divorce lawyer for 23 minutes and with Calk for 14 minutes, and exchanged text messages with Calk, (Fact Statement, ¶23.)

7

On October 24, Suttle forwarded Calk an e-mail from her divorce lawyer advising her to get the funds necessary to close to the trustee right away and asked Calk, "Please advise how this will or will not impact my loan and future refinance." (Fact Statement, ¶24.) Later on October 24, Suttle texted Calk saying, "Checking that I may be able to send balance today/tomorrow to your bank." (Id.)

On October 26, there were 10 calls between Suttle and her divorce lawyer and 3 calls between Suttle and Calk. (Fact Statement, ¶25.) At 2:40 that afternoon, Suttle texted Calk saying, "One of 2 things needs to happen, within 48 hours or Scott will be offered my house and will, subsequently, be buying my house. 1) Closing needs to be complete and funded within 48 hours OR 2) Trustee needs to have full amount wired to her escrow account, within 48 hours, while proceeding with closing. My attorney's # if you wish to speak with him. Or, with your permission, I'll give him your number and have him call you, later this afternoon. Howard Soypher (301) 951-9333." (Fact Statement, ¶26.) Suttle then texted Calk, "Jeff is not going to agree to Scott signing. Scott is not going to agree to signing the quit claim. Scott is willing to buy the house out from under his own kids to ensure that this fails and Debby's only other option isn't to put the house on the market." (Id.) Calk responded, "Will call you in the morning. I will do whatever you need me to do to make this happen." (Id.) Suttle replied, "Sounds good. Thanks." (Id.)

On October 27, there were three calls between Suttle and her divorce lawyer, (Fact Statement, ¶27), after which, at 3:50 that afternoon, Suttle and Calk had the following exchange of text messages:

Suttle:        Appreciating your efforts and staying out of your hair. Huge thanks.

Calk:          No hassle at all

| Suttle: | Thank you, thank you, thank you. |
| Calk: | Lots to do to pull this off by tomorrow |
| Suttle: | What can I do? |
| Calk: | Nada |
| Suttle: | Let me know how I can thank you and your staff when this is done.  I have faith but understand that much has to fall into place quickly for this to occur. |
| Calk: | I'm on it |
| Suttle: | [thumbs up emoji] Thanks!! |

(Id.)

At 10:23 p.m. on October 27, Suttle and Calk spoke on the phone for 31 minutes.  (Fact Statement, ¶28.)  At 9:29 a.m. on October 28, Suttle called her divorce lawyer.  (Fact Statement, ¶29.) The call lasted only one minute.  (Id.)  At 9:32 a.m., Suttle texted Calk saying, "I'm assuming you saw emails related to closing.  Any chance we can close today?"  (Fact Statement, ¶30.)  She then forwarded to Calk via text message an e-mail that the trustee, Deborah Reiser, had sent to Suttle's divorce attorney that morning.  It said, "Call me, Howard.  I agree that the title issue needs to be cleared, but that was Stephanie's responsibility to accomplish before the 11th hour.  My inclination is to wait until COB today for Stephanie to provide the funds to close.  I assume Scott will provide a quitclaim.  Failing that I will afford Scott the same 45 days, and failing that, I'll market the house."  (Id.)

Between 9:57 a.m. and 11:03 a.m. on October 28, there were 5 calls between Suttle and her divorce lawyer, and then Suttle and Calk spoke for 28 minutes beginning at 11:13 a.m.  (Fact Statement, ¶31.)  Suttle then spoke to her divorce lawyer again at 11:59 a.m., spoke to Calk again

at 12:53 p.m., and then spoke to her divorce lawyer again for 54 minutes beginning at 3:28 p.m. (Id.)

At some time that afternoon after 3:00 p.m., Suttle texted Calk saying, "Will sign and send your docs

as soon as I receive them." (Fact Statement, ¶32.) Calk responded, "Please expect an email from

Ryan Murphy our in house counsel with the documents", and Suttle replied, "Will look for them".

(Id.)

At 4:28 p.m. on October 28, Suttle received the loan documents from Ryan Muraphy and

eleven minutes later she e-mailed Murphy, "Printing and signing now. Will send to you, asap."

(Fact Statement, ¶33.) That afternoon, she had the following exchange of text messages with Calk

before she signed and returned the loan documents:

> Suttle:    Got the docs. I am reading them. Is someone available to discuss
> with me what I'm signing? How long do you expect this to be in
> place. And subsequently replaced by the refinance mortgage loan?
>
> Calk:    The term is one year. Assuming you pay your taxes, square away
> your credit and get me your income info on your divorce etc we can
> get you qualified and refi ASAP.

(Fact Statement, ¶34.)

Suttle then asked Calk that afternoon via text, "Do you have 2 minutes to answer questions?"

and Calk responded, "Yes. Calling now." (Id.) Calk called Suttle at 5:04 p.m. (Fact Statement,

¶35.) That call lasted only 1 minute, and he called back at 5:22 p.m. and spoke to Suttle for 15

minutes. (Id.) Suttle then called Calk at 6:19 p.m., and the two of them spoke for 5 minutes. (Id.)

Suttle sent the signed loan documents back to Murphy at The Federal Savings Bank

electronically between 6:27 p.m. and 6:29 p.m. on October 28, and at 6:31 that same evening,

Murphy e-mailed Suttle saying, "I have passed the documents that you have sent onto our Loan

Servicing Department." (Fact Statement, ¶36.) At 7:57 that evening, Suttle and Calk had the

10

following exchange of text messages:

> Suttle: Not that I have any money [crying emoji], may I buy you and your office lunch on Monday? Good deli sandwiches, or something? Small gesture of my appreciation for everyone's efforts.

> Calk: You are so sweet. Let's wait until we finish your final loan.

> Suttle: We can do it then, too! An even nicer lunch when I'm back to having more liquid assets.

(Fact Statement, ¶37.)

Suttle never did file her tax returns or pay her taxes, and she never did obtain a mortgage loan to refinance her bridge loan. (Fact Statement, ¶6 and ¶38.) On November 2, she told Moreno that she had bought the house and that she would get back in touch with him about refinancing it with a mortgage loan when she got her tax situation straightened out. (Fact Statement, ¶39.) On November 15, she e-mailed Moreno saying, "I'm hoping taxes will be done this week." (Fact Statement, ¶40.) She then stopped responding to Romero's e-mails. (Id.) Meanwhile, Suttle had started working with Bryan Landman ("Landman"), a loan officer at TFSB, on a refinance. (Fact Statement, ¶41.) She kept promising Landman and Calk, as she had promised Moreno, that she'd get her tax situation straightened out quickly. On November 22, she texted Calk, "Looks like taxes next week... ." (Fact Statement, ¶42.) On November 28, she texted him, "I believe taxes will be filed tomorrow." (Id.) But, she admitted at her deposition, that was a lie. (Id.) And on November 29, she texted him, "Taxes done." (Id..) But that was another lie; she had not then (and still has not) filed her tax returns or paid her taxes. (Id.)

On December 9, Landman e-mailed Suttle saying, "We really need the final, filed version of the 2015 and 2014 Tax Returns before this process is complete. (Fact Statement, ¶43.) He reminded

her again in e-mails he sent her on January 7 January 9, January 16, January 24, January 26, February 1, and February 6, 2017. (Id.)

On December 9, 2016, Suttle told Calk that she had already filed her tax returns and had sent copies of the filed returns to Landman, and on January 24 and again on January 26, 2017, she told Landman that she had previously sent him copies of her filed tax returns and would re-send them. (Fact Statement, ¶44.) But, as she admitted at her deposition, those were more lies. (Id.)

Finally, on February 8, 2017, Calk informed Suttle via e-mail that TFSB was denying her refinance application because, despite her numerous promises that she would be filing her tax returns soon and even a false assertion that she had filed the returns, she did not produce any copies of filed tax returns (because she had not filed them). (Fact Statement, ¶45.)

The text messages and e-mails quoted above contain no misrepresentation or promise about the term or interest rate of the loan, and make absolutely clear that Calk informed Suttle, and that Suttle understood, that this was a one-year bridge loan at a high interest rate, which Suttle said that she planned to refinance with a traditional mortgage loan at a lower interest rate after she'd filed her tax returns and paid her taxes. And when she was asked at her deposition what about her loan had been misrepresented to her by Calk, she was able to come up with nothing. She testified:

> Q.  Did Steve Calk ever misrepresent to you anything that was contained in the loan documents?
>
> A.  He misrepresented everything to me.
>
> Q.  Well, I need you to be more specific than that. I need you to give me a list of the things that you believe he misrepresented about the loan documents, about what was in them.
>
> Q.  It's difficult for me to explain what he misrepresented because he never specifically -- was specific on anything, and when I would ask specifics I

> would never get a specific answer. I would -- I would get a, "I do it for my friends and family, my neighbors, we'll get it done," and all that stuff. There was never specifics anywhere through this time other than, "I'm your friend, I'll help you, I'll get it done, we'll flip it."

(Suttle dep, Exhibit 1 hereto, p. 110.)

A specific false representation is required in order for a plaintiff to prevail on a fraud claim, and a specific promise is required in order for a plaintiff to prevail on a promissory estoppel claim. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 648, 762 N.E.2d 1, 7 (2001), *as modified on denial of reh'g* (Nov. 27, 2001); *Sass v. Andrew*, 152 Md. App. 406, 429, 832 A.2d 247, 260 (Md. App. 2003); *Avon Hardware Co. v. Ace Hardware Corp.*, 2013 IL App (1st) 130750, ¶ 23, 998 N.E.2d 1281, 1290; *Javitt v. Cunningham Contracting, Inc.*, 2016 WL 4493367, at *4 (Md. App. 2016); *Centro Medico Panamericano, Ltd v. Benefits Mgmt. Grp., Inc.*, 2016 IL App (1st) 151081, ¶ 25, 61 N.E.3d 160, 165; *Oliveira v. Sugarman*, 226 Md. App. 524, 553, 130 A.3d 1085, 1103 (Md. App. 2016), *aff'd*, 451 Md. 208, 152 A.3d 728 (Md. 2017). There is no evidence of any such representation or promise. All of the evidence is that Calk told Suttle that her loan was a high interest, short-term bridge loan. The defendants are entitled to summary judgment on Counts III, IV and V.

## II.    TFSB IS ENTITLED TO SUMMARY JUDGMENT ON THE TILA COUNTS

Loans "to finance the acquisition" of a dwelling are exempt from TILA's disclosure and rescission requirements. 15 U.S.C. § 1602(x). TFSB is entitled to summary judgment on the TILA counts (Counts I and II) because the loan at issue is exempt. Before the loan was made, Suttle owned an interest in the house, but she did not own the house. After she used the loan proceeds to buy her ex-husband's interest, she owned the house. Thus, she had acquired that house in that transaction,

13

and the loan had been used "to finance the acquisition". The argument is more fully developed in Defendant The Federal Savings Bank's Response to Plaintiff's Motion for Judgment on the Pleadings as to Liability Under TILA, (Doc. # 65), which argument is incorporated herein by reference.

## III.    TFSB IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM

The uncontradicted evidence is that Suttle borrowed $417,000 from TFSB on October 28, 2016 for a one-year term at an annual interest rate calculated as the one-year LIBOR rate plus 5% with a minimum rate of 7.25% and a maximum rate of 12.25%, and that she has never made a payment on her loan. (Fact Statement, ¶6 and ¶46.) The evidence is further uncontradicted that the fees to TFSB were $9,840. (Fact Statement, ¶47.) Finally, the evidence is uncontradicted that, on June 19, 2017, pursuant to its rights under the loan documents, TFSB accelerated the defaulted loan and used the $417,000 that Suttle had deposited into an account at TFSB as collateral for her loan to offset amounts owed on the loan. (Fact Statement, ¶48.) As of that date, after applying the $417,000, there was still due and owing from Suttle a principal balance of $10,398.82, and interest continued to accrue on that principal balance after that date at LIBOR + 5%. (Fact Statement, ¶49.)

Section 7 of the Loan Note provides, in pertinent part:

> Upon the occurrence of an Event of Default, which remains uncured beyond all applicable grace, notice and cure periods, which includes failure to pay when payments are due..., the Payee, at its option, may enforce the following remedies and or any other remedies available to the Payee under applicable law: ... declare an increase in the interest rate to thirteen percent (13%) per annum... ..

(Fact Statement, ¶50.)

On September 28, 2020, TFSB declared a increase in the interest rate to 13% per annum.

(Fact Statement, ¶51.) Interest on the remaining principal balance of $10,398.82 at LIBOR + 5%

14

from June 19, 2017 to September 28, 2020 was $2,576.05. (Fact Statement, ¶52.) Interest on the remaining principal balance of $10,398.82 at 13% from September 28, 2020 until paid is $3.755194 per diem. (($10,398.82 x 0.13)/360[4] = $3.755194.) TFSB is, therefore, entitled as a matter of law to judgment in its favor on its counterclaim in the amount of $12,974.87 (principal of $10,398.82 and interest at LIBOR + 5% thereon from June 19, 2017 to September 28, 2020) plus $3.755194 per diem from September 28, 2020 through the date of entry of judgment.

The loan documents also provide for the payment by Suttle of TFSB's attorneys' fees "incident to the...satisfaction" of the loan "upon the rendering of such bill and delivery thereof to" Suttle. (Fact Statement, ¶54.) Following entry of summary judgment, the Court should grant TFSB time to render a bill for its attorneys' fees to Suttle and leave to file a fee petition in the event that she fails to promptly pay that bill in full.

                                         **STEPHEN CALK and THE FEDERAL
                                         SAVINGS BANK**


                                         By____/s/  Daniel S Hefter_____
                                                  One of Their Attorneys


Daniel S Hefter
**HEFTER LAW, LTD.**
22 W. Washington, Suite 1500
Chicago, IL 606062
(312) 403-9292
dhefter@hefter-law.com

Dated: April 30, 2021

_____

[4]The Loan Note provides that interest is to be calculated on the basis of a 360-day year. (Fact Statement, ¶53.)

15

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on April 30, 2021, the foregoing Defendants' Memorandum of Law in Support of Their Summary Judgment Motion was served on all counsel who have appeared through the Court's electronic filing and service system.


      /s/ Daniel S. Hefter
Daniel S. Hefter

16