IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE SUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 cv 4541 |
| v. | ) | |
| | ) | |
| STEPHEN CALK and THE FEDERAL SAVINGS BANK, | ) | Judge Joan H. Lefkow |
| | ) | |
| | ) | |
| Defendants. | ) | |

### NOTICE OF FILING

To:  John D. Galarnyk
     Andrew J. Cuniff
     John Romanucci

PLEASE TAKE NOTICE that, on April 30, 2021, the attached Defendants' Statement of Material Facts as to Which There is No Genuine Issue was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division.

**STEPHEN CALK and THE FEDERAL SAVINGS BANK**

By  /s/  Daniel S. Hefter
     One of Their Attorneys

Daniel S Hefter
**HEFTER LAW, LTD.**
22 W. Washington
Suite 1500
Chicago, IL 60603
(312) 264-6565
dhefter@hefter-law.com

Dated: April 30, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE SUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 cv 4541 |
| v. | ) | |
| | ) | |
| STEPHEN CALK and THE FEDERAL SAVINGS BANK, | ) | Judge Joan H. Lefkow |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 56.1, defendant Stephen Calk and defendant/counter-plaintiff The Federal Savings Bank submit the following statement of material facts as to which there is no genuine issue in support of their motion for summary judgment:

1. The loan documents Stephanie Suttle ("Suttle") signed were for a one-year loan at an adjustable interest rate, calculated as the 1-year LIBOR rate plus 5%, with a minimum rate of 7.25% and a maximum rate of 12.25%. The 7.25% minimum rate prevailed during the entire one-year term of the loan. (Stephanie Suttle dep., Exhibit 1 hereto, p. 77 and Exhibit 18 thereto, p. 1; LIBOR historical rate compilation, https://www.macrotrends.net/1433/historical-libor-rates-chart, copy attached hereto as Exhibit 2[1].)

---

[1]FRE 201(b) provides, in pertinent part:

The court may judicially notice a fact that is not subject to reasonable dispute because it...can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Historical interest rates are a proper subject of judicial notice. *Stein v. JP Morgan Chase*

2. Suttle and her ex-husband were divorced on May 7, 2013. (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶5 and Exhibit 35 thereto and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶5.)

3. By the middle of 2016, the only unresolved financial issue between Suttle and her ex-husband was their marital home, which they jointly owned. (Suttle dep., Exhibit 1 hereto, pp. 10-11.)

4. Suttle wanted to purchase her ex-husband's interest in their former marital residence, needed approximately $398,000 to make the purchase, and had to get those funds to the trustee who had been appointed by the divorce court to sell it by October 28, 2016 or the house would be sold to her ex-husband or a third party. (Suttle dep., Exhibit 1 hereto, pp. 10-13 and p. 61; Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶4 and Exhibit 34 thereto and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶4.)

5. Suttle had begun working on a mortgage loan with Ramiro Moreno ("Moreno"), a loan officer at NFM Lending, in August of 2016. (Suttle dep., Exhibit 1 hereto, pp. 27-28; Ramiro Moreno dep., Exhibit 5 hereto, pp. 4-5.)

6. At all times from no later than October 16, 2013 through April 13, 2021, Suttle was

---

*Bank*, 279 F. Supp. 2d 286, 290 (S.D.N.Y. 2003).

FRE 201(c) provides, in pertinent part:

> The court...must take judicial notice if a party requests it and the court is supplied with the necessary information.

The defendants hereby request that the Court take judicial notice of the historical 1-year LIBOR interest rates for the relevant time period which the defendants have provided to the Court.

delinquent in filing her federal and state income tax returns and in paying her income taxes. (Stephanie Suttle's Answers to Defendants' Second Requests for Admission, Exhibit 6 hereto, ¶¶1-6; Suttle dep., Exhibit 1 hereto, pp. 29-30 and pp. 88-89 and Exhibit 8 thereto; Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibits 14, 18 and 20 thereto and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.) As of October 28, 2016, she had not filed her returns or paid her taxes for 2012, 2013, 2014, or 2015. (Id.) As of April 13, 2021, she had not filed her returns or paid her taxes for 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, or 2020 and owed more than $400,000 in back taxes, penalties, and interest. (Id.)

7. A person who has failed to file income tax returns and pay income taxes is not eligible for a traditional mortgage loan until the returns are filed and the taxes are paid. (Moreno dep., Exhibit 5 hereto, pp. 6-8; Stephen Calk deposition, Exhibit 7 hereto, pp. 27-28, p. 33; Stephen Calk affidavit, Exhibit 8 hereto, ¶5.)

8. On September 14, 2016, in an e-mail with "Tax Returns" in the subject line, Moreno said to Suttle:

> The answer was pretty short and sweet. Get with the tax guy and see what you need to do to get them filed as soon as you can.

(Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 6 thereto and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

9. On September 28, 2016, in an e-mail with "Following Up" in the subject line, Moreno asked Suttle:

> Any headway on the tax returns? Have you at least talked to the accountant yet?

3

(Moreno dep., Exhibit 5 hereto, pp. 6-7 and Exhibit 2 thereto; Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 5 thereto and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

10. Suttle had met Steve Calk ("Calk") in the late 1980s when she had lived in the Chicago area, and they became friends and dated briefly. (Suttle dep., Exhibit 1 hereto, pp. 8-10 and pp. 20-21; Calk dep., Exhibit 7 hereto, p. 16.) Other than friending one another on Facebook sometime in the late 2000s, they hadn't kept in contact between then and August 3, 2016, when Suttle responded over Facebook to an ad for refinancing that The Federal Savings Bank's marketing department had posted on Calk's Facebook page saying, "Timely. Thanks!" Calk responded, "Hi, Steph, if you are interested in refinancing give me a call on my cell at 312-961-7064. it would be great to catch up." She replied, "Will do." (Suttle dep., Exhibit 1 hereto, pp. 8-10, pp. 20-21 and Exhibit 2 thereto; Calk dep., Exhibit 7 hereto, pp. 16-17.)

11. Suttle's cell phone number in 2016 and 2017 was (301) 518-2400. (Suttle dep., Exhibit 1 hereto, p. 19.) Calk's cell phone number in 2016 and 2017 was (312) 961-7064. (Calk aff., Exhibit 8 hereto, ¶2.) At 4:34 p.m.[2] on August 8, 2016, Suttle called Calk and left him a voicemail. (Verizon records with records custodian's authentication, Exhibit 9 hereto, tenth page of exhibit labeled "Page 10 of 20"at top right; Defendant's Rule 902(11) Notice, Exhibit 10 hereto; Calk dep., Exhibit 7 hereto, pp. 27-36.) Calk returned the call at 10:04 p.m, on August 8, 2016, and he and Suttle spoke for 43 minutes. (Verizon records, Exhibit 9 hereto, eleventh page of exhibit labeled "Page 11 of 20" at top right; Calk dep., Exhibit 7 hereto, pp. 27-36.) They spoke again on August

---

[2]Suttle lives in Maryland and Calk lives in Chicago. In order to make it easy to follow the sequence of events, all times in this fact statement are stated in Eastern Time.

15 and on August 16, 2016. (Verizon records, Exhibit 9 hereto, twelfth and thirteenth pages of exhibit labeled, respectively, "Page 12 of 20" and "Page 13 of 20".) They then had no further contact until October 17, 2016. (Calk dep., Exhibit 7 hereto, pp. 36-38.)

12. Howard Soypher ("Soypher") was Suttle's divorce lawyer. (Soypher dep., Exhibit 11 hereto, p. 5.) In 2016 and 2017, his office phone number was (301) 951-9333 and his cell phone number was (410) 499-1807. (Id., pp. 4-5.) In the late morning and early afternoon of October 17, 2016, Suttle had three phone calls with Soypher that lasted for a total of 33 minutes. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-second page of exhibit labeled "9" at the bottom right.)

13. At 1:41 p.m. on October 17, 2016, Suttle called Calk's number. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-second page of exhibit labeled "9" at bottom right.) She apparently did not reach Calk on that call because it lasted only one minute, (id.), and at 1:43 p.m on October 17, 2016, she texted Calk saying, ""Hey. I'm in a bind. Wondering if you may be able to help." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, page SUTTLE 000498, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) Calk responded, "Will call shortly." (Id.)

14. At 1:43 p.m., on October 17, 2016, Suttle called Soypher. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-second page of exhibit labeled "9" at bottom right.)

15. At 1:47 p.m. on October 17, 2016, Suttle sent Moreno an e-mail about the possibility of using her own funds for the purchase and subsequently getting a mortgage after filing her tax returns and paying her taxes, but Moreno asked her to call him to discuss that because there were a number

5

of factors that could limit the amount of the loan she could get if she did that. (Moreno dep., Exhibit 5 hereto, pp. 9-11 and Exhibit 5 thereto; Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 14 thereto and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

16. A mortgage loan taken out on a home that the homeowner already owns free and clear is called a "cash out" loan. (Calk aff., Exhibit 8 hereto, ¶3.) In 2016, the interest rate for cash out mortgage loans was approximately 1.75% higher than the interest rate charged for purchase money mortgage loans, and cash out loans also carried with them a fee of 1.5% of the loan amount which was not charged for purchase money mortgage loans. (Calk dep., Exhibit 7 hereto, p. 42.)

17. If Stephanie Suttle took out a bridge loan and used it to purchase her ex-husband's interest in their former marital home, she could (if she met eligibility requirements for a traditional home mortgage loan) subsequently do what is called a "rate and term refinance" to refinance the entire amount of that loan with a traditional 30-year mortgage loan at the same interest rate and fees that apply to purchase money mortgage loans. (Calk dep., Exhibit 7 hereto, p. 42 and pp. -46-47; Calk aff., Exhibit 8 hereto, ¶4)

18. On October 18, 2016, Calk called Suttle and the two of them spoke on the phone for a total of 62 minutes ending ate 12:02 p.m. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-second page of exhibit labeled "9" at bottom right.) Suttle explained her predicament and Calk told Suttle that TFSB would make a bridge loan, but that it would have to be secured by cash deposited by Suttle in TFSB in the full amount of the loan (in addition to the mortgage on the house which was necessary in order for Suttle to subsequently do a rate and term refinance as she said she planned to do). (Calk dep., Exhibit 7 hereto, pp. 36-49.)

6

19. At 12:05 p.m. on October 18, 2016, Suttle called her divorce lawyer, Soypher. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-second page of exhibit labeled "9" at bottom right.) Later that afternoon, there were four calls between Suttle and Calk for a total of 18 minutes, and one more call from Suttle to Soypher. (Id.)

20. On the evening of October 20, 2016, Suttle spoke to her divorce lawyer, Soypher, for a total of 26 minutes and then, at 12:01 a.m. on October 21, 2016, she called Calk and the two of them spoke for 57 minutes. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-third page of exhibit, which bears no page number.)

21. At 7:48 a.m. on October 21, 2016, Suttle asked Calk via text message, "How much do I need to move over? $417K +/-?" . (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00502 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) Calk answered, "Yes Mam". (Id.) Suttle and Calk exchanged several more text messages that day regarding the transfer of money to The Federal Savings Bank to serve as collateral for the loan, (id., pp. SUTTLE 00502-09), and also exchanged three phone calls for a total of 9 minutes. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-third page of exhibit, which bears no page number.) One of Suttle's text messages to Calk on October 21, 2016 said, "... Earlier today I sent 2 wires totaling just over $381,000.00. I am awaiting the settlement of additional funds so that I may wire the balance of the $417,000.00 needed no later than Wednesday, October 26. I wish to buy out my ex husband's share of my home, payoff the existing mortgage and then refinance the home at a much more advantageous rate. Thank you for your assistance in this matter. With much appreciation". (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00505 and

Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.)

22. On October 23, 2016, Suttle spoke to her divorce lawyer at 9:49 a.m. and then, at 11:39 a.m., texted Calk with information regarding securities she had just sold and said, "This will be settling on Wed. $417K may be fully funded then." (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right; Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00510 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.)

23. On October 24, 2016, Suttle spoke with her divorce lawyer for 23 minutes and with Calk for 14 minutes, and exchanged text messages with Calk, " (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right; Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00511-12 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.)

24. On October 24, 2016, Suttle forwarded Calk an e-mail from her divorce attorney advising her to get the funds necessary to close to the trustee right away and asked Calk, "Please advise how this will or will not impact my loan and future refinance." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 1 thereto, pp. SUTTLE 00001-2 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.) ) Later on October 24, 2016, Suttle texted Calk saying, "Checking that I may be able to send balance today/tomorrow to your bank." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00511 and Stephanie Suttle's Answers to Defendants' Third

8

Requests For Admission, Exhibit 4 hereto, ¶2.)

25. On October 26, 2016, there were 10 calls between Suttle and her divorce lawyer and 3 calls between Suttle and Calk. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right.)

26. At 2:40 p.m. on October 26, 2016, Suttle texted Calk saying, "One of 2 things needs to happen, within 48 hours or Scott will be offered my house and will, subsequently, be buying my house. 1) Closing needs to be complete and funded within 48 hours OR 2) Trustee needs to have full amount wired to her escrow account, within 48 hours, while proceeding with closing. My attorney's # if you wish to speak with him. Or, with your permission, I'll give him your number and have him call you, later this afternoon. Howard Soypher (301) 951-9333." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00513 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) Suttle then texted Calk, "Jeff is not going to agree to Scott signing. Scott is not going to agree to signing the quit claim. Scott is willing to buy the house out from under his own kids to ensure that this fails and Debby's only other option isn't to put the house on the market." (Id., p. SUTTLE 00514.) Calk responded, "Will call you in the morning. I will do whatever you need me to do to make this happen." (Id., p. 00515.) Suttle replied, "Sounds good. Thanks." (Id.)

27. On October 27, 2016, there were three calls between Suttle and her divorce lawyer, (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right.) After those calls, at 3:50 that afternoon, Suttle and Calk had the following exchange of text messages:

Suttle: Appreciating your efforts and staying out of your hair. Huge thanks.

9

| | |
|---|---|
| Calk: | No hassle at all |
| Suttle: | Thank you, thank you, thank you. |
| Calk: | Lots to do to pull this off by tomorrow |
| Suttle: | What can I do? |
| Calk: | Nada |
| Suttle: | Let me know how I can thank you and your staff when this is done. I have faith but understand that much has to fall into place quickly for this to occur. |
| Calk: | I'm on it |
| Suttle: | [thumbs up emoji] Thanks!! |

(Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00515 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.)

28. At 10:23 p.m. on October 27, 2016, Suttle and Calk spoke on the phone for 31 minutes. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right.)

29. At 9:29 a.m. on October 28, 2016, Suttle called her divorce lawyer. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right.) The call lasted only one minute. (Id.)

30. At 9:32 a.m., on October 28, 2016, Suttle texted Calk saying, "I'm assuming you saw emails related to closing. Any chance we can close today?" (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00516 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) She then forwarded

10

to Calk via text message an e-mail that the trustee, Deborah Reiser, had sent to Suttle's divorce attorney that morning. It said, "Call me, Howard. I agree that the title issue needs to be cleared, but that was Stephanie's responsibility to accomplish before the 11th hour. My inclination is to wait until COB today for Stephanie to provide the funds to close. I assume Scott will provide a quitclaim. Failing that I will afford Scott the same 45 days, and failing that, I'll market the house." (Id.)

31. Between 9:57 a.m. and 11:03 a.m. on October 28, 2016, there were 5 calls between Suttle and her divorce lawyer, and then Suttle and Calk spoke for 28 minutes beginning at 11:13 a.m. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right.) Suttle then spoke to her divorce lawyer at 11:59 a.m., spoke to Calk at 12:53 p.m., and then spoke to her divorce lawyer again for 54 minutes beginning at 3:28 p.m. (Id., twenty-fifth page of exhibit labeled "7" at bottom right and twenty-sixth page of exhibit labeled "8" at bottom right.)

32. On October 28, 2016, at some time after 3:00 p.m., Suttle texted Calk saying, "Will sign and send your docs as soon as I receive them." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00517 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) Calk responded, "Please expect an email from Ryan Murphy our in house counsel with the documents", and Suttle replied, "Will look for them". (Id.)

33. At 4:28 p.m. on October 28, 2016, Suttle received the loan documents from Ryan Muraphy and, at 4:39 p.m. that afternoon she e-mailed Murphy, "Printing and signing now. Will send to you, asap." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 28 thereto, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit

11

4 hereto, ¶1.)

34. On the afternoon of October 28, 2016, Suttle had the following exchange of text messages with Calk before she signed and returned the loan documents:

| | |
|---|---|
| Suttle: | Got the docs. I am reading them. Is someone available to discuss with me what I'm signing? How long do you expect this to be in place. And subsequently replaced by the refinance mortgage loan? |
| Calk: | The term is one year. Assuming you pay your taxes, square away your credit and get me your income info on your divorce etc we can get you qualified and refi ASAP. |

(Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00518 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) Suttle then asked Calk that afternoon via text, "Do you have 2 minutes to answer questions?" and Calk responded, "Yes. Calling now." (Id.)

35. Calk called Suttle at 5:04 p.m. on October 28, 2016. (Verizon records with records custodian's authentication, Exhibit 9 hereto, twenty-sixth page of exhibit labeled "8" at bottom right.) That call lasted only 1 minute, and he called back at 5:22 p.m. and spoke to Suttle for 15 minutes. (Id.) Suttle then called Calk at 6:19 p.m., and the two of them spoke for 5 minutes. (Id.)

36. Suttle sent the signed loan documents back to Murphy at The Federal Savings Bank electronically between 6:27 p.m. and 6:29 p.m. on October 28, (Ryan Murphy aff., Exhibit 12 hereto, ¶3 and Sub-Exhibit A thereto), and at 6:31 that evening, Murphy e-mailed Suttle saying, "I have passed the documents that you have sent onto our Loan Servicing Department." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 28 thereto, p. SUTTLE 00149 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

37. At 7:57 p.m. on October 28, 2016, Suttle and Calk had the following exchange of text

12

messages:

> Suttle: Not that I have any money [crying emoji], may I buy you and your office lunch on Monday? Good deli sandwiches, or something? Small gesture of my appreciation for everyone's efforts.
>
> Calk: You are so sweet. Let's wait until we finish your final loan.
>
> Suttle: We can do it then, too! An even nicer lunch when I'm back to having more liquid assets.

(Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00519 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.)

38. Suttle never refinanced her bridge loan with a traditional mortgage loan with NFM Lending, with TFSB, or with any other lender. (Suttle dep., Exhibit 1 hereto, pp. 111-12.)

39. On November 2, 2016, Suttle told Moreno that she had bought the house and that she would get back in touch with him about refinancing it when she got her tax situation straightened out. (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 21 thereto, p. SUTTLE 00149 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

40. On November 15, 2016, Suttle e-mailed Moreno saying, "I'm hoping taxes will be done this week." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 22 thereto, p. SUTTLE 00149 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.) She then stopped responding to Romero's e-mails. (Suttle dep., pp. 99-100.)

41. Beginning sometime before December 9, 2016, Suttle was working with Bryan Landman ("Landman"), a loan officer at TFSB, on a refinance. (Defendants' Third Request for Admissions,

13

Exhibit 3 hereto, ¶1 and Exhibit 1 thereto, p. SUTTLE 00024, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

42. On November 22, 2016, Suttle texted Calk, "Looks like taxes next week... ." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00529 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) On November 28, 2016, she texted him, "I believe taxes will be filed tomorrow." (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00520 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2.) But, she admitted at her deposition, that was a lie. (Suttle dep., Exhibit 1 hereto, pp. 100-02.) And on November 29, 2016, she texted him, "Taxes done." (Id..) But that was another lie; she had not then (and still has not) filed her tax returns or paid her taxes. (Suttle dep., pp. 88-89.)

43. On December 9, 2016, Landman e-mailed Suttle saying, "We really need the final, filed version of the 2015 and 2014 Tax Returns before this process is complete. (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 1 thereto, p. SUTTLE 00023, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.) He reminded her again in e-mails he sent on January 7 January 9, January 16, January 24, January 26, February 1, and February 6, 2017. (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 1 thereto, pp. SUTTLE 00013-21, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

44. On December 9, 2016, Suttle told Calk that she had already filed her tax returns and sent copies of the filed returns to Landman, and on January 24, 2017, and again on January 26, 2017, she told Landman that she had previously sent him copies of her filed tax returns and would re-send

14

them. (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶2 and Exhibit 31 thereto, pp. SUTTLE 0053-34, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶2; Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 1 thereto, p. SUTTLE 00017 and p. SUTTLE 00015, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.) But, as she admitted at her deposition, those were more lies. (Suttle dep., pp. 104-106 and pp. 88-89.)

45. On February 8, 2017, Calk informed Suttle via e-mail that TFSB was denying her refinance application because, despite her numerous promises that she would be filing her tax returns soon and even false assertions that she had filed the returns, she did not produce any copies of filed tax returns (because she had not filed them). (Defendants' Third Request for Admissions, Exhibit 3 hereto, ¶1 and Exhibit 1 thereto, pp. SUTTLE 00011-12, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit 4 hereto, ¶1.)

46. Suttle has never made any payments on her loan from TFSB. (Suttle dep., Exhibit 1 hereto, p. 109.)

47. The fees to TFSB for making the Suttle loan were $9,840. (Suttle dep., Exhibit 1 hereto, p. 81 and Exhibit 19 thereto; First Amended Complaint, Doc. #17, ¶38.)

48. On June 19, 2017, TFSB used the $417,000 that Suttle had deposited into an account at TFSB as collateral for her loan to offset amounts owed on the loan. (Murphy aff., Exhibit 12 hereto, ¶4 and Sub-Exhibit B thereto.)

49. As of June 19, 2017, after applying the $417,000 that was in Suttle's TFSB account to amounts owed on the loan, there was still due and owing from Suttle a principal balance of $10,398.82. (LIBOR historical rate compilation,

https://www.macrotrends.net/1433/historical-libor-rates-chart, copy attached hereto as Exhibit 2;

spreadsheet, Exhibit 13 hereto.)

      50. Section 7 of the Loan Note provides, in pertinent part:

Upon the occurrence of an Event of Default, which remains uncured beyond all applicable grace, notice and cure periods, which includes failure to pay when payments are due..., the Payee, at its option, may enforce the following remedies and or any other remedies available to the Payee under applicable law: ... declare an increase in the interest rate to thirteen percent (13%) per annum... ..

(Suttle dep., Exhibit 1 hereto, p. 77 and Exhibit 18 thereto.)

      51. On September 28, 2020, TFSB declared a increase in the interest rate to 13% per annum. (Doc. #37, p. 23.)

      52. Interest on the remaining principal balance of $10,398.82 at LIBOR + 5% from June 19, 2017 to September 28, 2020 is $2,576.05. (LIBOR historical rate compilation, https://www.macrotrends.net/1433/historical-libor-rates-chart, copy attached hereto as Exhibit 2; spreadsheet, Exhibit 13 hereto.)

      53. The Loan Note for Suttle's loan from TFSB provides that interest is to be calculated on the basis of a 360-day year. (Suttle dep., Exhibit 1 hereto, p. 77 and Exhibit 18 thereto, §3(a).)

      54. The Loan Note and the Loan Agreement for Suttle's loan from TFSB each provide for the payment by Suttle of TFSB's attorneys' fees "incident to the...satisfaction" of the loan "upon the rendering of such bill and delivery thereof to" Suttle. (Suttle dep., Exhibit 1 hereto, p. 77, p. 81, Exhibit 18 thereto, p. 5 and Exhibit 19 thereto, p. A-6.)

<div style="text-align: right;">

**STEPHEN CALK and THE FEDERAL SAVINGS BANK**

By      /s/   Daniel S Hefter
       One of Their Attorneys

</div>

Daniel S Hefter
**HEFTER LAW, LTD.**
22 W. Washington
Suite 1500
Chicago, IL 606062
(312) 264-6565
dhefter@hefter-law.com

Dated: April 30, 2021

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on April 30, 2021, the foregoing Defendants' Statement of Material Facts as to Which There is No Genuine Issue was served on all counsel who have appeared through the Court's electronic filing and service system.

<div style="text-align: right;">

/s/ Daniel S. Hefter
Daniel S. Hefter

</div>