IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE SUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 cv 4541 |
| v. | ) | |
| | ) | |
| STEPHEN CALK and THE FEDERAL SAVINGS BANK, | ) | Judge Joan H. Lefkow |
| | ) | |
| | ) | |
| Defendants. | ) | |

### NOTICE OF FILING

To: John D. Galarnyk
Andrew J. Cuniff
John Romanucci

    PLEASE TAKE NOTICE that, on May 8, 2021, the attached Defendants' Memorandum of Law in Support of Their Motion for Rule 11 Sanctions was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division.

**STEPHEN CALK and THE FEDERAL SAVINGS BANK**

By   /s/ Daniel S. Hefter
      One of Their Attorneys

Daniel S Hefter
**HEFTER LAW, LTD.**
22 W. Washington
Suite 1500
Chicago, IL 60603
(312) 264-6565
dhefter@hefter-law.com

Dated: May 8, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE SUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19 cv 4541 |
| v. | ) | |
| | ) | |
| STEPHEN CALK and THE FEDERAL SAVINGS BANK, | ) | Judge Joan H. Lefkow |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR RULE 11 SANCTIONS**

**INTRODUCTION**

F.R.Civ.P. 11 provides for sanctions for the filing of a pleading premised on allegations for which there is no evidence. *Navarro-Ayala v. Nunez*, 968 F.2d 1421, 1425–26 (1st Cir. 1992). As demonstrated below, that is what happened in this case, and the plaintiff's counsel refused to voluntarily dismiss after being requested to do so pursuant to Rule 11's "safe harbor" provision, and even after the defendants' counsel had pointed out in interrogatory answers (attached hereto as Exhibit A) that the e-mails and text messages between the plaintiff and defendant Stephen Calk ("Calk") indisputably establish that the plaintiff's state law claims are premised on false allegations.

**ARGUMENT**

The plaintiff, Stephanie Suttle ("Suttle"), borrowed money from defendant The Federal Savings Bank ("TFSB") in 2016 to purchase her ex-husband's interest in their former marital home, in which Suttle was living. (Doc. #17, ¶8, and ¶24.) The loan was for a term of one year, and the

interest rate was LIBOR plus 5%, with a minimum rate of 7.25%[1] and a maximum rate of 12.25%. (Stephanie Suttle deposition, Exhibit A hereto, p. 77 and Exhibit 18 thereto.) Defendant Calk, an executive of TFSB at the time, arranged the loan. (Doc. #17, ¶12 and ¶24.)

The plaintiff's original Complaint in this case, (Doc. #1), asserted only claims under the Truth in Lending Act ("TILA"), 15 U.S.C.A. § 1601, *et seq*. and its implementing regulation, Regulation Z, 12 C.F.R. Pt. 226. The sole operative allegations of the original Complaint were that the plaintiff had taken out a loan from TFSB with respect to which she had not been given disclosures which she contended the law required, and that her subsequent demand that the loan be rescinded was not honored. The original Complaint named both TFSB and Calk as a defendants. (Doc. #1.)

---

[1] The interest rate stayed at the minimum of 7.25% for the entire one-year term of the loan. (LIBOR historical rate compilation, https://www.macrotrends.net/1433/historical-libor-rates-chart, copy attached hereto as Exhibit B.)

FRE 201(b) provides, in pertinent part:

The court may judicially notice a fact that is not subject to reasonable dispute because it...can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Historical interest rates are a proper subject of judicial notice. *Stein v. JP Morgan Chase Bank*, 279 F. Supp. 2d 286, 290 (S.D.N.Y. 2003).

FRE 201(c) provides, in pertinent part:

The court...must take judicial notice if a party requests it and the court is supplied with the necessary information.

The defendants hereby request that the Court take judicial notice of the historical 1-year LIBOR interest rates for the relevant time period which the defendants have provided to the Court.

Both defendants moved to dismiss the original Complaint on the ground that the loan at issue is of a type that is exempt from the TILA disclosure and rescission provisions, and Calk further moved to dismiss on the ground that the law is clear that only a "creditor", as that term is defined in the statute, can be held liable for the type of TILA violation alleged, and that, under the allegations of the Complaint, Calk does not fit TILA's definition of a "creditor".. (Doc. #s 8 and 9.)

Rather than contest the motion to dismiss, the plaintiff's counsel filed a First Amended Complaint, (Doc. #17), which asserted the TILA claims only against TFSB but, in a move apparently designed to keep Calk in the case despite there being no evidence in support of any claim against him, the plaintiff's counsel also added three state law counts, all of which are premised on allegations that the plaintiff was misled by Calk about the term and interest rate of her loan. Specifically, the First Amended Complaint alleges that Calk represented/promised that TFSB would make a 30-year mortgage loan to Suttle at the rate of interest applicable to such loans at the time, and that, instead, Suttle's loan was a one-year bridge loan at a significantly higher rate of interest. The First Amended Complaint alleges:

> This action involves a bait-and-switch loan transaction by the Defendants who steered Suttle away from another lender by enticing her with better terms and a faster closing to refinance her home. They then misled Suttle into signing loan documents for a high cost, high-interest, short term bridge loan that Suttle never wanted or requested.
>
> ...
>
> 33. Instead of receiving the mortgage refinance she was promised, Calk and FSB switched from what they had promised and substituted with a one-year, high-interest bridge loan.
>
> ..
>
> 66. The Defendants engag[ed] in a "bait and switch" scheme to sell Suttle a

3

>   high-interest, short term bridge loan instead of a traditional mortgage refinance as promised... .

(Doc. #17, unnumbered paragraph on page 1, ¶33 and ¶66.)

Based on the allegations that Calk had represented/promised that TFSB would give the plaintiff a traditional 30-year mortgage loan but actually provided a one-year, high-interest bridge loan, the plaintiff's counsel added claims for common law fraud, statutory consumer fraud, and promissory estoppel. (Doc. #17.) There is not a shred of evidence to support the allegations on which those claims are premised, and, as demonstrated below, there is a plethora of evidence – **including contemporaneous text messages and e-mails between Calk and Suttle** – that indisputably establish that Calk clearly told Suttle before she signed any loan documents that her loan would be a one-year bridge loan at an interest rate significantly higher than the rate at which 30-year mortgage loans were made, and that Suttle understood that

### The Evidence

Suttle had been divorced and wanted to buy out her ex-husband's interest in their marital home. (Doc. #17, ¶8.) She needed to get the funds for the purchase to the trustee who had been appointed by the divorce court to sell the house by October 28, 2016 or the house would be sold to her ex-husband or a third party. ((Suttle dep., Exhibit C hereto, pp. 10-13 and p. 61.)

Suttle began working on a mortgage loan with Ramiro Moreno, a loan officer at NFM Lending, in August of 2016. (Suttle dep., Exhibit C hereto, pp. 27-28; Romero Moreno deposition, Exhibit D hereto, pp. 4-5.) But she was delinquent in filing her income tax returns and paying her income taxes, (Stephanie Suttle's Answers to Defendants' Second Request for Admissions, attached hereto as Exhibit E, ¶¶1-6; Suttle dep., Exhibit C hereto, pp. 29-30 and pp. 88-89 and Exhibit 8

4

thereto.) As of the fall of 2016, she hadn't filed a federal or state income tax return for 2012, 2013, 2014, 2015, or 2016, and she owed the federal government and the State of Maryland thousands of dollars in back taxes, penalties, and interest. (Id.)[2] Moreno told Suttle that she could not get a mortgage loan until she got current on filing her tax returns and paying her taxes, and he repeatedly urged her to get that done so that her mortgage loan application with NFM could move forward. On September 14, in an e-mail with "Tax Returns" in the subject line, Moreno said to Suttle:

> The answer was pretty short and sweet. Get with the tax guy and see what you need to do to get them filed as soon as you can.

(Defendants' Third Request for Admissions, Exhibit F hereto, ¶1 and Exhibit 6 thereto and Stephanie Suttle's Answers to Defendants' Third Requests for Admission, Exhibit G hereto, ¶1)

On September 28, in an e-mail with "Following Up" in the subject line, he asked her:

Any headway on the tax returns? Have you at least talked to the accountant yet?

(Moreno dep., Exhibit D hereto, pp. 6-7 and Exhibit 2 thereto.)

Moreno testified at his deposition:

> Q. ... And it says, "Any headway on the tax returns? Have you at least talked to the accountant yet?" What were you referring to there?
>
> A. She had...several years where she had not filed taxes.
>
> ...
>
> Q. ... In 2016 and 2017, was it the case that at NFM Lending, a home mortgage loan can't be made to a person who is not current in filing income tax returns and paying taxes?

---

[2]As of the date on which her deposition was taken in this case, April 13, 2021, she still hadn't filed any of those tax returns, she also hadn't filed any for 2017, 2018, 2019, 2020, or 2021, and she owed over $400,000 in back taxes, penalties and interest. (Stephanie Suttle's Answers to Defendants' Second Requests for Admission, Exhibit E hereto, ¶¶1-6; Suttle dep., Exhibit C hereto, pp. 29-30 and pp. 88-89 and Exhibit 8 thereto.)

> A. We cannot close a loan until, yeah, the taxes are filed.
>
> Q. And you've worked for other lenders besides NFM, correct?
>
> A. Yep.
>
> Q. How many others?
>
> A. Including NFM, four.
>
> Q. ... And was it the case that at each of your employers, a residential mortgage loan could not be made to a person who was not current in filing tax returns and paying taxes?
>
> A. ... [I]n my experience, in every mortgage company I've worked for, it's my understanding that tax returns need to be filed and current, the answer is yes.

(Moreno dep., Exhibit C hereto, pp. 6-8.)

Suttle had met Steve Calk in the late 1980s when she had lived in the Chicago area, and they became friends and dated briefly. (Suttle dep., Exhibit C hereto, pp. 8-10 and pp. 20-21; Calk dep., Exhibit H hereto, p. 16.) They hadn't kept in contact between then and 2016, but on August 3, 2016, Suttle responded over Facebook to an ad for refinancing that TFSB's marketing department had posted on Calk's Facebook page saying, "Timely. Thanks!" Calk responded, "Hi, Steph, if you are interested in refinancing give me a call on my cell at 312-961-7064. it would be great to catch up." She replied, "Will do." (Suttle dep., Exhibit C hereto, pp. 8-10, pp. 20-21 and Exhibit 2 thereto; Calk dep., Exhibit H hereto, pp. 16-17.)

At 4:34 p.m.[3] on August 8, Suttle called Calk and left him a voicemail. (Verizon records with records custodian's authentication, Exhibit J hereto, tenth page of exhibit labeled "Page 10 of

---

[3] Suttle lives in Maryland and Calk lives in Chicago. In order to make it easy to follow the sequence of events, all times in this brief are stated in Eastern Time.

6

20"at top right[4]; Defendant's Rule 902(11) Notice, Exhibit K hereto; Calk dep., Exhibit H hereto, pp. 27-36.) Calk returned the call at 10:04 p.m, and he and Suttle spoke for 43 minutes. (Verizon records, Exhibit J hereto, eleventh page of exhibit labeled "Page 11 of 20" at top right; Calk dep., Exhibit H hereto, pp. 27-36.) They spoke again on August 15 and on August 16. (Verizon records, Exhibit J hereto, twelfth and thirteenth pages of exhibit labeled, respectively, "Page 12 of 20" and "Page 13 of 20".) They then had no further contact until October 17. (Calk dep., Exhibit H hereto, pp. 36-38.)

Howard Soypher ("Soypher") was Suttle's divorce lawyer. (Soypher dep., Exhibit L hereto, p. 5.) In the late morning and early afternoon of October 17, Suttle had three phone calls with Soypher that lasted for a total of 33 minutes. (Verizon records, Exhibit J hereto, twenty-second page of exhibit labeled "9" at the bottom right.)[5] Then at 1:41 p.m., Suttle called Calk's number. (Verizon records, Exhibit J hereto, twenty-second page of exhibit labeled "9" at bottom right.) She apparently did not reach Calk on that call because it lasted only one minute, (id.), and at 1:43 p.m, she texted Calk saying, "Hey. I'm in a bind. Wondering if you may be able to help." (Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, page SUTTLE 000498, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.) Calk responded, "Will call shortly." (Id.)

Also at 1:43 p.m., on October 17, Suttle called Soypher. (Verizon records with records, Exhibit

---

[4]Suttle's cell phone number in 2016 and 2017 was (301) 518-2400. (Suttle dep., Exhibit C hereto, p. 19.) Calk's cell phone number in 2016 and 2017 was (312) 961-7064. (Calk aff., Exhibit I hereto, ¶2.)

[5]In 2016 and 2017, Soypher's office phone number was (301) 951-9333 and his cell phone number was (410) 499-1807. (Soypher dep., Exhibit L hereto, pp. 4-5.)

J hereto, twenty-second page of exhibit labeled "9" at bottom right.) At 1:47 p.m., just after her call with Soypher, Suttle sent Moreno an e-mail about the possibility of using her own funds for the purchase and subsequently getting a mortgage after filing her tax returns and paying her taxes, but Moreno asked her to call him to discuss that because there were a number of factors that could limit the amount of the loan she could get if she did that. (Moreno dep., Exhibit D hereto, pp. 9-11 and Exhibit 5 thereto; Defendants' Third Request for Admissions, Exhibit F hereto, ¶1 and Exhibit 14 thereto and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶1.) In addition, a "cash out" mortgage loan (which is what a loan is called if the borrower already owns the home and takes out a mortgage loan to get cash) has a higher interest rate and higher fees than a purchase money mortgage loan. (Calk aff., Exhibit I hereto, ¶3.) If, instead, Suttle took out a bridge loan and used it to purchase her ex-husband's interest in their former marital home, she could (if she subsequently met eligibility requirements for a traditional home mortgage loan, including filing her delinquent tax returns and paying her back taxes) do what is called a "rate and term refinance" to refinance the entire amount of that loan with a traditional 30-year mortgage loan at the same interest rate and fees that apply to purchase money mortgage loans. (Calk dep., Exhibit H hereto, p. 42 and pp. -46-47; Calk aff., Exhibit I hereto, ¶4)

On October 18, Calk called Suttle and the two of them spoke on the phone for a total of 62 minutes ending at 12:02 p.m. (Verizon records, Exhibit J hereto, twenty-second page of exhibit labeled "9" at bottom right.) Suttle explained her predicament and Calk told Suttle that TFSB would make a bridge loan, but that it would have to be secured by cash deposited by Suttle in TFSB in the full amount of the loan (in addition to the mortgage on the house which was necessary in order for Suttle to subsequently do a rate and term refinance as she said she planned to do). (Calk dep., Exhibit

H hereto, pp. 36-49.)  Suttle then had two calls with Soypher and four more with Calk that day. (Verizon records with records custodian's authentication, Exhibit J hereto, twenty-second page of exhibit labeled "9" at bottom right.)

On the evening of October 20, Suttle spoke to Soypher, for a total of 26 minutes and then, at 12:01 a.m. on October 21, she called Calk and the two of them spoke for 57 minutes. (Verizon records with records custodian's authentication, Exhibit J hereto, twenty-third page of exhibit, which bears no page number.)

At 7:48 a.m. on October 21, Suttle asked Calk via text message, "How much do I need to move over? $417K +/-?" (Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00502 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.) Calk answered, "Yes Mam". (Id.) Suttle and Calk exchanged several more text messages that day regarding the transfer of money to TFSB to serve as collateral for the loan, (id., pp. SUTTLE 00502-09), and also exchanged three phone calls for a total of 9 minutes. (Verizon records, Exhibit J hereto, twenty-third page of exhibit, which bears no page number.)  One of Suttle's text messages to Calk on October 21 said, "... Earlier today I sent 2 wires totaling just over $381,000.00.  I am awaiting the settlement of additional funds so that I may wire the balance of the $417,000.00 needed no later than Wednesday, October 26**. I wish to buy out my ex husband's share of my home, payoff the existing mortgage and then refinance the home at a much more advantageous rate**.  Thank you for your assistance in this matter.  With much appreciation". (Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00505 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2 (emphasis added).)

On October 23, Suttle spoke to Soypher at 9:49 a.m. and then, at 11:39 a.m., texted Calk with information regarding securities she had just sold and said, "This will be settling on Wed. $417K may be fully funded then." (Verizon records with records, Exhibit J hereto, twenty-fifth page of exhibit labeled "7" at bottom right; Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00510 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.)

On October 24, Suttle spoke with Soypher for 23 minutes and with Calk for 14 minutes, and exchanged text messages with Calk, " (Verizon records, Exhibit J hereto, twenty-fifth page of exhibit labeled "7" at bottom right; Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00511-12 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.) Also on October 24, Suttle forwarded Calk an e-mail she had received from Soypher advising her to get the funds necessary to close to the trustee right away and asked Calk, "Please advise how this will or will not impact **my loan and future refinance**." (Defendants' Third Request for Admissions, Exhibit F hereto, ¶1 and Exhibit 1 thereto, pp. SUTTLE 00001-2 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶1 (emphasis added).) Later on October 24, Suttle texted Calk saying, "Checking that I may be able to send balance today/tomorrow to your bank." (Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00511 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.)

On October 26, there were 10 calls between Suttle and her Soypher and 3 calls between Suttle and Calk. (Verizon records, Exhibit J hereto, twenty-fifth page of exhibit labeled "7" at bottom right.) At 2:40 p.m. on October 26, Suttle texted Calk saying:

10

> One of 2 things needs to happen, within 48 hours or Scott will be offered my house and will, subsequently, be buying my house. 1) Closing needs to be complete and funded within 48 hours OR 2) Trustee needs to have full amount wired to her escrow account, within 48 hours, while proceeding with closing. My attorney's # if you wish to speak with him. Or, with your permission, I'll give him your number and have him call you, later this afternoon. Howard Soypher (301) 951-9333.

(Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00513 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.)

Suttle then texted Calk, "Jeff is not going to agree to Scott signing. Scott is not going to agree to signing the quit claim. Scott is willing to buy the house out from under his own kids to ensure that this fails and Debby's only other option isn't to put the house on the market." (Id., p. SUTTLE 00514.) Calk responded, "Will call you in the morning. I will do whatever you need me to do to make this happen." (Id., p. 00515.) Suttle replied, "Sounds good. Thanks." (Id.)

On October 27, there were three calls between Suttle and Soypher, (Verizon, Exhibit J hereto, twenty-fifth page of exhibit labeled "7" at bottom right.) After those calls, at 3:50 that afternoon, Suttle and Calk had the following exchange of text messages:

| | |
|---|---|
| Suttle: | Appreciating your efforts and staying out of your hair. Huge thanks. |
| Calk: | No hassle at all |
| Suttle: | Thank you, thank you, thank you. |
| Calk: | Lots to do to pull this off by tomorrow |
| Suttle: | What can I do? |
| Calk: | Nada |
| Suttle: | Let me know how I can thank you and your staff when this is done. I have faith but understand that much has to fall into place quickly for |

11

        this to occur.

Calk:        I'm on it

Suttle:        [thumbs up emoji] Thanks!!

(Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00515 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.)

At 10:23 p.m. on October 27, Suttle and Calk spoke on the phone for 31 minutes. (Verizon records, Exhibit J hereto, twenty-fifth page of exhibit labeled "7" at bottom right.) At 9:29 a.m. on October 28, Suttle called Soypher, (Verizon records with records, Exhibit 9 hereto, twenty-fifth page of exhibit labeled "7" at bottom right), and then at 9:32 a.m. she texted Calk saying, "I'm assuming you saw emails related to closing. Any chance we can close today?" (Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00516 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.) She then forwarded to Calk via text message an e-mail that the trustee, Deborah Reiser, had sent to Soypher that morning. It said:

> Call me, Howard. I agree that the title issue needs to be cleared, but that was Stephanie's responsibility to accomplish before the 11th hour. My inclination is to wait until COB today for Stephanie to provide the funds to close. I assume Scott will provide a quitclaim. Failing that I will afford Scott the same 45 days, and failing that, I'll market the house."

(Id.)

Between 9:57 a.m. and 11:03 a.m. on October 28, there were 5 calls between Suttle and Soypher, and then Suttle and Calk spoke for 28 minutes beginning at 11:13 a.m. (Verizon records, Exhibit J hereto, twenty-fifth page of exhibit labeled "7" at bottom right.) Suttle then spoke to

12

Soypher at 11:59 a.m., spoke to Calk at 12:53 p.m., and then spoke to Soypher again for 54 minutes beginning at 3:28 p.m. (Id., twenty-fifth page of exhibit labeled "7" at bottom right and twenty-sixth page of exhibit labeled "8" at bottom right.)

Sometime after 3:00 p.m. on October 28, Suttle texted Calk saying, "Will sign and send your docs as soon as I receive them." (Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00517 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2.) Calk responded, "Please expect an email from Ryan Murphy our in house counsel with the documents", and Suttle replied, "Will look for them". (Id.)

At 4:28 p.m. on October 28, Suttle received the loan documents from Ryan Murphy and, at 4:39 that afternoon, she e-mailed Murphy, "Printing and signing now. Will send to you, asap." (Defendants' Third Request for Admissions, Exhibit F hereto, ¶1 and Exhibit 28 thereto, and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶1.)

On the afternoon of October 28, before she signed the loan documents, Suttle had the following exchange of text messages with Calk:

> Suttle: Got the docs. I am reading them. Is someone available to discuss with me what I'm signing? **How long do you expect this to be in place. And subsequently replaced by the refinance mortgage loan?**
>
> Calk: **The term is one year**. **Assuming you pay your taxes, square away your credit and get me your income info on your divorce etc we can get you qualified and refi ASAP.**

(Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00518 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2 (emphasis added).) Suttle then asked Calk that afternoon via text, "Do you have 2 minutes

13

to answer questions?" and Calk responded, "Yes. Calling now." (Id.) He called her at 5:04 p.m. (Verizon records, Exhibit J hereto, twenty-sixth page of exhibit labeled "8" at bottom right.) That call lasted only 1 minute, and he called back at 5:22 p.m. and spoke to Suttle for 15 minutes. (Id.) Suttle then called Calk at 6:19 p.m., and the two of them spoke for 5 minutes. (Id.) Suttle then sent the signed loan documents back to Murphy at TFSB electronically between 6:27 p.m. and 6:29 p.m. on October 28, (Ryan Murphy aff.,Exhibit M hereto, ¶3 and Sub-Exhibit A thereto), and at 6:31 that evening, Murphy e-mailed Suttle saying, "I have passed the documents that you have sent onto our Loan Servicing Department." (Defendants' Third Request for Admissions, Exhibit F hereto, ¶1 and Exhibit 28 thereto, p. SUTTLE 00149 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶1.)

  At 7:57 p.m. on October 28, Suttle and Calk had the following exchange of text messages:

| | |
|---|---|
| Suttle: | Not that I have any money [crying emoji], may I buy you and your office lunch on Monday? Good deli sandwiches, or something? Small gesture of my appreciation for everyone's efforts. |
| Calk: | You are so sweet. **Let's wait until we finish your final loan**. |
| Suttle: | **We can do it then, too! An even nicer lunch when I'm back to having more liquid assets.** |

(Defendants' Third Request for Admissions, Exhibit F hereto, ¶2 and Exhibit 31 thereto, p. SUTTLE 00519 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶2 (emphasis added).)

  For months after Suttle got her bridge loan from TFSB, both NFM and TFSB kept prodding her to get her tax returns filed and her taxes paid so that she could refinance the bridge loan with a traditional mortgage loan, and Suttle kept promising both that she would do get her returns filed and

14

her taxes paid. (Defendants' Third Request for Admissions, Exhibit F hereto, ¶1 and ¶2 and Exhibits 21 and 22 thereto, and Exhibit 31 thereto, pp. SUTTLE 00011-21, p. SUTTLE 00519, pp. SUTTLE 524-25, and p. SUTTLE 00529 and Stephanie Suttle's Answers to Defendants' Third Requests For Admission, Exhibit G hereto, ¶1 and ¶2.) But she never did file those returns or pay those taxes, so she never did refinance the bridge loan with a traditional mortgage loan. (Stephanie Suttle's Answers to Defendants' Second Requests for Admission, Exhibit E hereto, ¶¶1-6; Suttle dep., Exhibit C hereto, pp. 29-30, pp. 88-89 and Exhibit 8 thereto, and pp. 111-12.)

## CONCLUSION

The text messages and e-mails quoted above indisputably establish that the plaintiff's state law claims were filed with no factual basis whatsoever, and the plaintiff's counsel refused to dismiss those claims even after the defendants' counsel laid out the evidence in an interrogatory answer. (The Federal Savings Bank's Answers and Objections to Plaintiff's First Set of Interrogatories, Exhibit A hereto, answers to Interrogatories Nos. 5 and 7.) The defendants have incurred substantial attorneys fees and litigation expenses defending against these baseless claims. The Court should, therefore, order the plaintiff's counsel to pay those fees and costs as a sanction pursuant to Rule 11.

          **STEPHEN CALK and THE FEDERAL SAVINGS BANK**

          By    /s/   Daniel S Hefter
                  One of Their Attorneys

Daniel S Hefter
**HEFTER LAW, LTD.**
22 W. Washington
Suite 1500
Chicago, IL 606062
(312) 264-6565
dhefter@hefter-law.com

Dated: May 7, 2021

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on May 8, 2021, the foregoing Defendants' Memorandum of Law in Support of Their Motion for Rule 11 Sanctions wass served on all counsel who have appeared through the Court's electronic filing and service system.

                                                      /s/ Daniel S. Hefter
                                                        Daniel S. Hefter