IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE SUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19 C 4541 |
| | ) | |
| STEPHEN CALK and THE FEDERAL | ) | Judge Joan H. Lefkow |
| SAVINGS BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In 2019, Stephanie Suttle filed this action against defendants The Federal Savings Bank (FSB) and former FSB executive Stephen Calk for claims under the Truth in Lending Act (TILA), 15 U.S.C. § 1601, the Illinois Consumer Fraud Act (ICFA), 815 Ill. Comp. Stat. 505/1, common law fraud, and promissory estoppel. (Dkts. 1, 17.) FSB counterclaimed for amounts Suttle allegedly owes under a loan agreement. (Dkt. 37.) Defendants have moved for summary judgment on all of Suttle's claims and FSB's counterclaim. (Dkt. 104.) Suttle has cross-moved for summary judgment on her TILA claims alone. (Dkt. 109.) For the following reasons, Suttle's motion for summary judgment is granted; defendants' motion for summary judgment is granted as to Suttle's common law fraud and promissory estoppel claims; and defendants' motion is denied as to Suttle's TILA and ICFA claims and FSB's counterclaim.

## BACKGROUND

### I.  Objections to Local Rule 56.1 Statements of Undisputed Material Facts

As an initial matter, the parties' objections to each other's Local Rule 56.1 submissions and related exhibits require resolution before turning to the undisputed facts.

### A. Defendants' objections to Suttle's expert report and Suttle's affidavit

Defendants object to the admissibility of two evidentiary exhibits. First, they object to the admissibility of an expert report submitted in support of Suttle's Local Rule 56.1 statement of undisputed facts on the basis that it improperly offers legal conclusions. (Dkt. 117.) Experts may not answer a legal question central to the case's resolution. *See Good Shepherd Manor Found., Inc.* v. *City of Momence*, 323 F.3 556, 564 (7th Cir. 2003). Among other opinions about the mortgage industry, Suttle's expert opines on whether her loan is exempt from TILA requirements. (Dkt. 110-5 at 15–19.) This is precisely the legal question that determines the outcome of her TILA claims. Therefore, the legal conclusions offered in the report are stricken and will not be considered.

Second, defendants object to the following statements in Suttle's affidavit submitted in support of her response to defendant's motion for summary judgment on the ground that they are "conclusory statements" rather than "statements of specific facts" and are therefore inadmissible. (Dkt. 126 at 6.)

6. [M]ost of my funds were held in my retirement accounts.

23. After our bitter divorce, I struggled with my personal and financial affairs.

24. My ex-husband also improperly claimed both of my children as dependents on his tax returns.

25. I was overwhelmed and struggling with my divorce.

36. [Calk] promised me a mortgage[.]

42. Steve . . . made me feel like I was being ungrateful or insulting[.]

63. [I]t was too late for me to do anything else.

64. After I received the loan documents from FSB, Steve pressured me to sign them.

66. [Calk] was already acting upset and antagonized.

70. I had no choice but to continue trying to work with Steve [Calk.]

(Dkt. 126 at 6 (citing dkt. 118-1) (cleaned up).) Of these, only Paragraph 36 is material to the disposition of the motions before the court. As such, the challenged paragraphs are considered only to the extent that they would be admissible at trial, i.e., relevant and supported by proper foundation. *See Davis* v. *City of Chi.*, 841 F.2d 186, 189 (7th Cir. 1988) (citing Fed. R. Evid. 602).

**B. Suttle's objections to defendants' statement of additional material facts**

Suttle objects to the statements made in paragraphs 1 and 2 of defendants' Local Rule 56.1(b)(3) statement of additional material facts. Paragraph 1 provides: "The primary purpose of the loan at issue in this case was to finance the plaintiff's acquisition of her ex-husband's interest in their former marital home." (Dkt. 124, ¶ 1.) Paragraph 2, in relevant part, states: "The Federal Savings Bank wired $398,776.34 . . . to be used for the purchase of the plaintiff's ex-husband's interest in their former marital home . . . . Of that amount, approximately $330,000 was used to acquire the ex-husband's interest in the home[.]" (*Id.* ¶ 2.)

Although not stated as such, Suttle's objections to these statements—specifically the words "acquisition," "purchase," and "acquire"—appear to be related to defendants' argument that the loan at issue was for an "acquisition" of Suttle's home and thus qualified under the residential mortgage exemption to TILA's disclosure and rescission requirements. (Dkt. 115 at 3.) Whether Suttle's loan is exempt under TILA is a legal question, and defendants' characterization of the loan as an "acquisition" is a legal argument, not a statement "grounded in specific facts." *See Bordelon* v. *Board of Educ.*, 811 F.3d 984, 989 (7th Cir. 2016). Therefore, these assertions are construed only as factual statements regarding Suttle's procurement of the loan and FSB's transfer of funds to Suttle's divorce trustee. Any legal conclusions in Paragraphs 1 and 2 are disregarded.

3

II.     **Undisputed Facts Regarding Suttle's Loan**

The following facts are undisputed. In 2016, Suttle sought to resolve lingering issues

from her 2013 divorce. (Dkt. 119, ¶¶ 2–3.) Relevant to this case, Suttle wanted to purchase her

ex-husband's interest in their marital home and to do so needed to provide by October 28, 2016

the requisite funds to a trustee overseeing the divorce proceeding. (*Id.* ¶ 4.) Suttle started the

process of obtaining a loan with NFM Lending (*id.* ¶ 5) but ultimately decided to obtain a loan

from FSB (dkt. 117, ¶¶ 7–9). Suttle was aware of FSB because of her connection to Calk, an

executive at FSB, whom she had known since the 1980s. (Dkt. 119, ¶ 10.) In August 2016, while

still working with NFM Lending, Suttle discussed with Calk her financial situation and desire for

a loan. (*Id.* ¶¶ 10–11.)

On or around October 21, 2016, Suttle opened an account at FSB and on Calk's

instruction began transferring funds to it. (*Id.* ¶ 21.) Suttle ultimately transferred $417,000 to

FSB. (The parties dispute whether Suttle knew that these funds were to serve as collateral for a

loan and that she would not be able to access them. (*Id.*; dkt. 118 at 3; dkt. 126, ¶ 4.)) On

October 28, 2016, at approximately 11:45 AM (Eastern Time), FSB wired $398,276.34 from

Suttle's account to the trustee. (Dkt. 126, ¶ 6.) Suttle received the Loan Note and Loan

Agreement documents several hours after FSB transferred the funds to the trustee. (Dkt. 119,

¶ 36.) Suttle and Calk then exchanged the following text messages:

> Suttle: Got the docs. I am reading them. Is someone available to discuss
> with me what I'm signing? How long do you expect this to be in place[?] And
> subsequently replaced by the refinance mortgage loan?

> Calk: The term is one year. Assuming you pay your taxes, square away
> your credit and get me your income info on your divorce etc[.] we can get you
> qualified and refi ASAP.

> Suttle: Do I have . . . access to the balance of the $417K? I'll start getting
> info to you or whomever is handling my loan[] now. What do you need? Who do

I send it to? Do you have 2 minutes to answer questions? How much fees are eating into the $417k? Fees [p]aid up front or prorated for term of loan?

Calk: Yes. Calling now.

(Dkt. 119, ¶ 34; dkt. 119-5 at 21 (cleaned up).)

Suttle and Calk spoke on the phone after this exchange, but the contents of that conversation remain in dispute. (Dkt. 119, ¶ 35.) Suttle signed and sent the documents to the FSB loan officer later that evening. (*Id.* ¶ 36.) FSB did not provide Suttle with disclosure forms that are required for most loans under TILA, including notice of the option to rescind the loan. (Dkt. 117, ¶ 9.) Suttle ultimately received a one-year bridge loan at an adjustable interest rate, ranging from 7.25% to 12.25%, which was secured by the $417,000 that she deposited at FSB as well as a mortgage that FSB took on her home. (Dkt. 119, ¶ 1; dkt. 126, ¶ 13.)

In the months that followed, Suttle, Calk, and FSB had various discussions about refinancing the bridge loan and procuring a traditional mortgage loan. (*Id.* ¶¶ 41–43; dkt. 126, ¶¶ 21–25.) To obtain a traditional mortgage loan, FSB required that Suttle provide copies of her filed taxes from 2012 to 2015, which she did not do. (Dkt. 119, ¶¶ 6, 21.)[1] In February 2017, Calk informed Suttle by email that her refinancing application was being denied. (*Id.* ¶ 45.) Communications dropped off, and Suttle never refinanced the bridge loan or obtained a traditional mortgage loan. (*Id.* ¶ 38.) On July 5, 2018, Suttle sent FSB a letter giving notice that she was rescinding the loan. (Dkt. 124, ¶ 2.) FSB did not respond. (Dkt. 126, ¶ 25.) Suttle then brought this action against Calk and FSB. (Dkt. 17.)

---

[1] It is disputed whether Suttle was informed of this requirement before the bridge loan transaction. (Dkt. 119, ¶ 15.)

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact, entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant has the burden of showing that there is no genuine, material factual dispute. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). If the movant carries its burden, the non-movant must then show a genuine dispute of fact supported by "proper documentary evidence." *Weaver* v. *Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). Still, the court views all facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In resolving cross-motions for summary judgment, courts "look to the burden of proof that each party would bear on an issue at trial; courts then require that party to go beyond the pleadings and affirmatively [] establish a genuine issue of material fact." *Santaella* v. *Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (internal citation omitted).

## ANALYSIS

### I.      Suttle is Entitled to Summary Judgment on her TILA Claims

Suttle seeks summary judgment on two issues: (1) that FSB is liable under TILA for failing to provide the requisite disclosures, and (2) that she is therefore entitled to rescission.[2] (Dkt. 109 at 3.) FSB also seeks summary judgment on Suttle's TILA claims, arguing that Suttle's

---

[2] Suttle has not moved for summary judgment on statutory or compensatory damages, arguing that there remains a genuine dispute of fact as to those amounts. (Dkt. 109 at 3.)

loan was a residential mortgage and therefore exempt from TILA's disclosure and rescission requirements.[3]

A.    **TILA and Regulation Z**

TILA "has the broad purpose of promoting 'the informed use of credit' by assuring 'meaningful disclosure of credit terms' to consumers." *Ford Motor Credit Co.* v. *Milhollin*, 444 U.S. 555, 559 (1980) (quoting 15 U.S.C. § 1601). To accomplish this goal, Congress delegated authority to the Federal Reserve Board to promulgate regulations under TILA. *See Fridman* v. *NYCB Mortg. Co., LLC*, 780 F.3d 773, 776 (7th Cir. 2015).[4] Relevant here, the Board promulgated Regulation Z, which provides detailed disclosure requirements for certain consumer credit transactions. 12 C.F.R. § 226.1. TILA and Regulation Z further provide for a right of rescission and require notice thereof for any loan transaction in which the borrower's principal dwelling is used as security. *See* 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23. TILA and its regulations require "hypertechnical" compliance by lenders. *See Handy* v. *Anchor Mortg. Co.*, 464 F.3d 760, 764 (7th Cir. 2006). A lender's compliance with TILA and Regulation Z's disclosure requirements is a question of law. *See Smith* v. *Check-N-Go of Ill., Inc.*, 200 F.3d 511, 514–15 (7th Cir. 1999).

---

[3] FSB acknowledges that the court previously decided that Suttle's loan was not a residential mortgage transaction under TILA (dkt. 33 at 5–6) but asks the court to reconsider this determination in light of its argument that the Official Staff Interpretation of Regulation Z is irrational, (dkt. 115). The court previously noted that this argument was raised only in reply in support of the motion to dismiss and was therefore not considered in the court's decision. (Dkt. 33 at 6 n.4.) Because Suttle has had the opportunity to respond on this go-round, the court exercises its discretion to consider the argument in this document.

[4] The Consumer Finance Protection Bureau now has authority to promulgate regulations under Regulation Z, but the Official Staff Interpretation at issue was created by the Board and remains unchanged. *See Fridman*, 780 F.3d at 773.

TILA, however, exempts certain transactions from its disclosure and rescission requirements. 15 U.S.C. § 1635(e). Relevant here, TILA exempts residential mortgage transactions. *Id.* § 1635(e)(1); *see also* 12 C.F.R. § 226.23(f)(1) ("The right to rescind does not apply to . . . [a] residential mortgage transaction."). Under TILA, a "residential mortgage transaction" is one "in which a mortgage . . . is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling." 15 U.S.C. § 1602(x). Additionally, according to the Board's Official Staff Interpretation of Regulation Z, a residential mortgage transaction "does not include a transaction involving a consumer's principal dwelling if the consumer had previously purchased and acquired some interest to the dwelling, even though the consumer had not acquired full legal title." 12 C.F.R. Pt. 226, Supp. I, Subpt. A § 226.2(a)(24)(5)(i). "Examples of new transactions involving a previously acquired dwelling include . . . an extension of credit made to a joint owner of property to buy out the other joint owner's interest." *Id.* § 226.2(a)(24)(5)(ii).

### B.    Rationality of the Official Staff Interpretation

Because it is undisputed that FSB failed to provide the disclosure forms required by TILA, FSB's only argument for avoiding TILA liability is that the Board's Interpretation of Regulation Z—specifically its statement that the residential mortgage exemption does not apply where the "consumer had previously purchased and acquired some interest to the dwelling"—is irrational and should be disregarded.

Courts defer to the Board's Interpretations of Regulation Z unless they are "demonstrably irrational." *Ford Motor Credit Co.*, 444 U.S. at 565. An Interpretation is not irrational so long as it is consistent with the general purpose and plain language of the statute. *See Fridman*, 780 F.3d at 776–77.

8

Here, the Interpretation of Regulation Z is not irrational. First, the Interpretation accords with TILA's purpose. Broadly speaking, TILA's general purpose is "to improve information in credit transactions and thus enhance the efficiency of credit markets, relying on 'meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available' to achieve this goal." *Hamm* v. *Ameriquest Mortg. Co.*, 506 F.3d 525, 528 (7th Cir. 2007) (quoting 15 U.S.C. § 1601(a)). More specifically, TILA was designed in part to "prevent homeowners from being victimized by 'vicious secondary mortgage schemes.'" *Anderson Bros. Ford* v. *Valencia*, 452 U.S. 205, 221 (1981) (internal citation omitted).

The Interpretation is consistent with both of these purposes. Under a subpart of the Interpretation titled "Acquisition," the Interpretation excludes from the definition of "residential mortgage transaction" those transactions where a "consumer had previously purchased and acquired some interest to the dwelling[.]" 12 C.F.R. Pt. 226, Supp. I, Subpt. A § 226.2(a)(24)(5)(i). Thus, the Interpretation indicates that loans secured by a home are not exempt from the disclosure and rescission requirements of TILA and Regulation Z where the consumer already has an interest in that home. *Id.* This plainly comports with TILA's more specific purpose of protecting current homeowners from predatory secondary mortgages. *See Anderson Bros.*, 452 U.S. at 221. And this understanding of the residential mortgage exemption, which narrows its coverage to exclude those current homeowners, also tracks TILA's purpose of promoting the informed use of credit more broadly. *See* 15 U.S.C. § 1601(a).

Second, the Interpretation likewise accords with TILA's plain language. TILA provides that the disclosure and rescission requirements do not apply to a residential mortgage transaction, s*ee* 15 U.S.C. § 1635(e)(1), which arises when a security interest "is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling." *Id.*

§ 1602(x). Regulation Z echoes TILA's language: "The right to rescind does not apply to . . . [a] residential mortgage transaction." 12 C.F.R. § 226.23(f)(1).

The Interpretation of Regulation Z then explains that a mortgage cannot be for the purpose of financing the acquisition of a home—as provided by the statute—if the consumer has already "purchased and acquired" the home, "even though the consumer had not acquired full legal title." 12 C.F.R. Pt. 226, Supp. I, Subpt. A § 226.2(a)(24)(5)(i). Put simply, the Interpretation takes a black-and-white view of the term "acquisition." Once a consumer has some interest in the dwelling, she is considered to have already "acquired" it, and thus, her loan is not exempt. Although other understandings of the residential mortgage exemption and the term "acquisition" within the statute may be plausible, the Interpretation does not conflict with TILA's purpose or plain language and is therefore rational.

None of FSB's arguments to the contrary is persuasive. First, it asserts that the Interpretation's position on the word "acquisition" is contrary to the term's meaning in § 1602(x) of TILA. FSB views the word "acquisition" as encompassing situations like Suttle's where a joint homeowner increases her interest in a dwelling. FSB analogizes to a situation where a CEO who owns some shares of his company's stock purchases the remaining shares, thereby "acquiring" the company. Therefore, like the CEO with his company, FSB claims, a homeowner buying out her ex-husband's interest in their home is also "acquiring" the home, and therefore should be within TILA's residential mortgage exemption. FSB further notes that § 1602(x) describes loans for "acquisition or initial construction," and, it argues, the absence of the word "initial" in front of the word "acquisition" demonstrates that TILA contemplates exempting *all* "acquisition" loans, not just those where the consumer has no interest in the home.

10

FSB's interpretation of "acquisition" is logical, but it is not the *only* logical reading of the term in the statute. As explained above, the Interpretation's explanation of "acquisition" as referring to a consumer who enters the transaction without an interest and excluding consumers who already had some interest in the dwelling is "equally sensible" and therefore not irrational. *Fridman*, 780 F.3d at 777.

Next, FSB asserts that the Interpretation is not rational because its distinction "between those borrowers who 'had previously purchased and acquired' an interest and those who had not" is arbitrary and based on no logical principle. (Dkt. 115 at 13.) FSB reiterates this sentiment throughout its argument, but in doing so, it scrutinizes the phrase "previously purchased and acquired" in a "vacuum," rather than looking at how the phrase functions in the context of TILA as a whole. *See Gundy* v. *United States*, 139 S. Ct. 2116, 2126 (2019). As described above, this distinction is sound when considering both TILA's plain language and its purpose, specifically the purpose of protecting current homeowners from secondary mortgage loan agreements that they would not have entered had they known the risks. *See Anderson Bros.*, 452 U.S. at 221.

Moreover, although FSB cites several cases from around the country discussing the contours of the residential mortgage exemption (dkt. 115 at 12–13), none explicitly construes the statute and Interpretation exactly as FSB would. The closest case is *Barnes* v. *Chase Home Fin., LLC*, 934 F.3d 901 (9th Cir. 2019), which determined that the exemption applied to a scenario where the plaintiff had previously purchased a dwelling, divested his interest in it, and then sought a loan to re-acquire it. *Id.* at 907–08. *Barnes* reasoned that the statutory definition of "residential mortgage transaction" includes all acquisitions or re-acquisitions because "the word 'initial' modifies only the word 'construction.'" *Id.* at 907 (quoting 15 U.S.C. § 1602(x)). But *Barnes* also approved of the district court's conclusion that the Interpretation "unambiguously

refers to a situation"—like Suttle's—"in which the borrower increases an existing interest ownership using loan proceeds, rather than a situation in which the borrower reacquires a property in which he had given up all ownership interest." *Id.* at 908.

FSB argues that *Barnes* misreads the Interpretation because the Interpretation never actually says that it only applies to those consumers with a *current* interest in the home. The Interpretation does, however, explicitly refer to situations where, despite previously purchasing and acquiring "*some* interest to the dwelling, the consumer had not acquired full legal title." 12 C.F.R. Pt. 226, Supp. I, Subpt. A § 226.2(a)(24)(5)(i) (emphasis added). It also provides examples that demonstrate the Regulation's application to such scenarios. *Id.* § 226.2(a)(24)(5)(ii). Taken together with the statute's purpose, which includes protecting current homeowners from predatory secondary mortgages, *see Anderson*, 453 U.S. at 221, *Barnes*'s reading of the Interpretation and the Interpretation itself both appear to be consistent with Regulation Z and TILA as a whole.

Finally, FSB cursorily argues that the Official Interpretation irrationally distinguishes between people who merely "acquired" property, such as heirs to an estate, and those who "purchased *and* acquired" it, but it cites no authority where the Interpretation was construed as such.

In summary, FSB has not demonstrated that the Interpretation's definition of "residential mortgage transaction" is irrational. As a result, and because FSB failed to provide the requisite disclosures and notice forms, Suttle is entitled to summary judgment on her TILA claims.

12

## II. Suttle is Entitled to Rescission Under TILA, and FSB is not entitled to Summary Judgment on its Counterclaim

Suttle also seeks rescission under TILA. (Dkt. 109 at 12–13.) She argues that to fully unwind the transaction, FSB "can simply retain the $398,276.34 it paid out on the loan from her cash collateral account" and then return the remaining balance. (*Id.* at 13.)

Rescission under TILA "requires unwinding the transaction in its entirety[.]" *Andrews* v. *Chevy Chase Bank*, 545 F.3d 570, 573 (7th Cir. 2008) (internal citation omitted). This requires both parties—not just the lender—to give back what they received in the transaction. *See Iroanyah* v. *Bank of Am.*, 753 F.3d 686, 692 (7th Cir. 2014). Here, the loan was secured not just by FSB's security interest in Suttle's home but also by the $417,000 in Suttle's FSB bank account. Thus, Suttle's tender obligations are met by FSB's retaining the amount of funds equal to what it transferred to the divorce trustee.

FSB argues that even if Suttle is entitled to rescission, her proposed terms are inequitable. Rescission, even under TILA, "is an *equitable* remedy that, in the absence of court intervention, would ordinarily require the consent of both parties to accept certain obligations." *Iroanyah*, 753 F.3d at 691 (emphasis in original). FSB therefore asks the court to require Suttle to repay the unpaid interest that accrued on Suttle's loan during the two years before she requested rescission. (Dkt. 115 at 15.) But because of its failure to make the disclosures required by TILA, FSB "forfeits its right to collect interest[.]" *Handy*, 464 F.3d at 766 (citing 15 U.S.C. § 1635(b)).

Furthermore, Suttle acted to rescind the loan within the three-year timeframe allowed by TILA and Regulation Z. 15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(a)(3). FSB also has not demonstrated how Suttle benefitted from her bridge loan in the two years prior to her notice of rescission. Suttle had no access to the $417,000 she deposited at FSB and FSB also took a security interest in her home, leaving her in the same position that she would have been in had

13

she purchased her ex-husband's interest in cash but with the added encumbrance of FSB's mortgage. Additionally, although Suttle's failure to refinance the bridge loan may be partly attributable to her delinquent taxes, that does not negate FSB's TILA violations.

Therefore, Suttle's motion for summary judgment on the issue of rescission under TILA is granted. FSB is entitled to retain $398,276.34 out of Suttle's cash collateral, representing the value of the loan it provided to Suttle, but it must relinquish its security interest in Suttle's home and return the remaining balance of $18,723.66 to her. Likewise, because it is not entitled to interest or fees, FSB's motion for summary judgment on its counterclaim is denied.

## III. Defendants are Entitled to Summary Judgment on Suttle's Common Law Fraud and Promissory Estoppel Claims, but not her ICFA Claim

Defendants have moved for summary judgment on Suttle's ICFA, common law fraud, and promissory estoppel claims, brought against both FSB and Calk, arguing that Suttle cannot show that any actionable misrepresentation occurred under each claim. Suttle argues that each of the state law claims presents a genuine dispute of fact. Although the claims share a common element of a representation or misrepresentation, the contours of each are slightly different. As such, each is examined in turn below.

### A. Choice of Law

At the threshold, the court must address which state's law applies. Defendants previously argued that Maryland law, rather than Illinois law, should govern Suttle's claims. (Dkt. 20 at 4–9.) Now, however, defendants contend that they are entitled to summary judgment regardless of which state's law applies. (Dkt. 105 at 2 n.1.) As they note, the court need not engage in a choice of law analysis if the laws of the two jurisdictions do not conflict. *See Sosa* v. *Onfido, Inc.*, 8 F.4th 631, 638 (7th Cir. 2021); *Townsend* v. *Sears, Roebuck and Co.*, 879 N.E.2d 893, 898 (Ill.

2007) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome.").

Neither party has demonstrated a conflict between Maryland and Illinois law, [5] and the court has found none. Therefore, the court applies Illinois law to resolve the remaining issues on summary judgment. *See Sosa*, 8 F.4th at 638; *SBC Holdings, Inc.* v. *Travelers Cas. & Sur. Co.*, 872 N.E.2d 10, 21 (2007) ("In the absence of a conflict, Illinois law applies as the law of the forum.").

**A. ICFA**

To support an ICFA claim, a plaintiff must show "that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Vanzant* v. *Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019); *see Connick* v. *Suzuki Motor Co.*, 675 N.E.2d 584, 593 (1996).

Defendants first argue that Suttle lacks sufficient evidence for a reasonable jury to conclude that any specific misrepresentations were made to her regarding the loan. Defendants assert that the statements that Suttle claims Calk made, such as telling her to "trust him" and that he would quickly "flip" her loan into a traditional mortgage loan, are too vague to constitute a deceptive act under ICFA. (Dkt. 118-1, ¶¶ 44–48.) Defendants also point to Suttle's deposition testimony, where, when asked what Calk had misrepresented to her, she stated:

---

[5] Despite first claiming that there are no relevant conflicts between Maryland and Illinois law, defendants argue in a footnote in their reply brief that there is a potential conflict between the Maryland Consumer Protection Act and the Illinois Consumer Fraud Act where the Maryland Act does not recognize a cause of action based on "unfair" conduct. (Dkt. 125 at 12 n.11.) Because this argument was raised only in their reply brief, and in a footnote at that, it is forfeited. *See White* v. *United States*, 8 F.4th 547, 552 (7th Cir. 2021). Regardless, because Suttle has provided evidence of omissions of material fact sufficient to survive summary judgment under either statute, this potential conflict does not affect the disposition of defendants' motion. *See Townsend*, 879 N.E.2d at 898.

> It's difficult for me to explain what he misrepresented because he never specifically -- was specific on anything, and when I would ask specifics I would never get a specific answer. I would -- I would get a, "I do it for my friends and family, my neighbors, we'll get it done," and all that stuff. There was never specifics anywhere through this time other than, "I'm your friend, I'll help you, I'll get it done, we'll flip it."

(Dkt. 106-1 at 29.)

Although these statements are too vague to constitute actionable misrepresentations, Suttle's ICFA claim survives on two other bases. First, unlike common law fraud, an ICFA claim may be based on a failure to disclose a material fact to the consumer.[6] *See White* v. *DaimerChrysler Corp.*, 856 N.E.2d 542, 549 (Ill. App. Ct. 2006). A fact is material under ICFA if the consumer would not have chosen to enter into the transaction had she known of it. *See Lipinski* v. *Martin J. Kelly Oldsmobile, Inc.*, 759 N.E.2d 66, 72 (Ill. App. Ct. 2001). Here, Suttle has pointed to at least two specific omissions of material fact that support her ICFA claim: (1) that defendants failed to inform her that her ability to obtain a traditional mortgage loan was conditioned on the filing of her previously unpaid taxes (dkt. 118-3 at 10), and (2) that defendants did not inform her that she would not have to access the $417,000 because it was to serve as collateral for the loan (*id.* at 13). In addition, she states that she would not have agreed to the transaction had she known these facts, (dkt. 118-1, ¶ 73), rendering them material under ICFA, *see Lipinski*, 759 N.E.2d at 72. Suttle's testimony is sufficient evidence for a reasonable jury to conclude that defendants violated ICFA by omitting a material fact. 815 Ill. Comp. Stat. 505/2; *see Marr* v. *Bank of Am., N.A.*, 662 F.3d 963, 968 (7th Cir. 2011) (uncorroborated testimony based on personal knowledge sufficient to create genuine fact dispute).

---

[6] The Maryland Consumer Protection Act appears to provide for similar coverage. Md. Code Ann. Com. Law § 13-301(3); *see Green* v. *H&R Block Inc.*, 735 A.2d 1039, 1058–59 (Md. 1999) (MCPA covers omissions of a material fact).

Second, an ICFA claim may be based on evidence of an unfair practice rather than a deceptive statement or act. A defendant's conduct is unfair under ICFA if it meets any of the following criteria: (1) it violates public policy; (2) it is so oppressive that the consumer has little choice but to submit to it; or (3) it causes consumers substantial injury. *See Siegel* v. *Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (citing *Robinson* v. *Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002)). Violations of statutes like TILA and related agency directives can be evidence of unfair conduct that violates public policy, deprives the consumer of meaningful choice, or causes substantial injury. *See Boyd* v. *U.S. Bank, N.A.*, *ex rel. Sasco Aames Mortg. Loan Tr., Series 2003-1*, 787 F. Supp. 2d 747, 753–54 (N.D. Ill. 2011); *Lanier* v. *Assoc. Fin., Inc.*, 499 N.E.2d 440, 447 (Ill. 1986). Here, FSB admittedly did not provide the disclosures required under TILA, including a notice of the option to rescind the loan. Suttle has therefore presented sufficient evidence on which a reasonable jury could conclude that defendants' conduct constituted an unfair practice in violation of ICFA.

Although defendants provide a barebones argument in their reply brief that Suttle cannot establish an unfair practice under ICFA because it is an "extremely high" bar (dkt. 125 at 12 n.11), the sole case that they cite, *Saccameno* v. *Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609 (N.D. Ill. 2019), does not support this assertion. The *Saccameno* court wrote that "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 630. Further, the court noted that a defendant's failure to follow statutory or administrative rules can be evidence of an ICFA violation, refuting the argument that Suttle has not shown evidence of a possible unfair practice here. *Id.*

Finally, defendants argue that Suttle's state law claims are foreclosed because Calk told her the key terms of the loan before she signed the loan documents on October 28, 2016. Suttle

17

responds by noting that the text message containing the loan terms was sent only after FSB transferred her loan funds to the divorce trustee. According to defendants, this is typical in a transaction involving a trustee, and the transaction was not finalized until Suttle signed the documents. Although Calk's text message to Suttle indisputably included some of the key terms, it did not include the fact that Suttle would not have access to the funds in her FSB bank account or the specific requirements for refinancing her loan. (Dkt. 119, ¶ 34.) The contents of the conversations that Suttle and Calk had between the time that Calk sent the text message and the time that Suttle signed the loan documents also remain disputed. (Dkt. 119, ¶ 35.) And, as described above, it is undisputed that Suttle was never provided the disclosures required by TILA, which can be evidence of an ICFA violation even if other terms were disclosed to her.

Therefore, defendants are not entitled to summary judgment on Suttle's ICFA claim because a genuine dispute of fact remains. Suttle should, however, consider whether this claim can be dismissed in light of the court's ruling regarding her TILA claims, as noted in her motion for summary judgment. (Dkt. 109 at 3.)

### B. Fraud

Defendants next argue that they are entitled to summary judgment on Suttle's fraud claim. To recover on a fraud claim under Illinois law,[7] the plaintiff must establish that: (1) the defendant made a false statement of material fact; (2) the defendant knew the statement was false; (3) in making the statement, the defendant intended to induce the plaintiff to act; (4) the plaintiff did act in reliance on the statement; and (5) the plaintiff was damaged because she relied on the false statement. *See Connick*, 675 N.E.2d at 591.

---

[7] A Maryland common law fraud claim has virtually the same requirements. *See Hoffman* v. *Stamper*, 867 A.2d 276, 292 (Md. 2005).

Defendants focus on the first element, arguing that Suttle cannot prove that they made a false statement of material fact. To survive summary judgment, a plaintiff must set forth clear and convincing evidence of a specific factual misrepresentation. *See LaScola* v. *U.S. Sprint Commc'ns*, 946 F.2d 559, 568 (7th Cir. 1991). Thus, defendants are correct that Suttle's deposition testimony, cited above, in which she said that Calk did not make a "specific" representation to her, is not enough to support a fraud claim.

Furthermore, although Suttle describes various omissions of material fact, these are not actionable as common law fraud absent proof of a confidential relationship between the parties. *See White*, 856 N.E.2d at 549.[8] The only affirmative statements that Suttle points to are (1) that Calk "promised her a mortgage," (2) that Calk stated he would "flip" her bridge loan into a traditional mortgage, and (3) that NFM lending would not be able to get her the loan she wanted.

None of these statements is sufficient. As to the first, FSB did obtain a mortgage over Suttle's home to secure the loan, making this statement true. To the extent that this statement can be construed to mean that Calk promised Suttle a traditional residential mortgage loan, Suttle has not provided clarifying facts supporting this statement, including the "what, where, and when" details required for fraud claims under Illinois law. *Connick*, 675 N.E.2d at 497. Likewise, the third statement regarding NFM's ability to provide the loan that Suttle wanted also lacks these necessary details. *See id.*; *LaScola*, 946 F.3d at 568.

The second statement promising to "flip" Suttle's loan into a traditional mortgage is more aligned with a promissory fraud claim because it is a promise to do something in the future "with no present intention of fulfilling it." *JP Morgan Chase Bank, N.A.* v. *Asia Pulp & Paper Co.,*

---

[8] The same would be true if Maryland law applied. *See Lloyd* v. *Gen. Motors Corp.*, 916 A.2d 257, 275 (Md. 2007) (noting that a plaintiff bringing a common law fraud claim based on omission of material fact must prove a fiduciary relationship or other circumstances that require a defendant to disclose the fact).

*Ltd.*, 707 F.3d 853, 865 (7th Cir. 2013). But promissory fraud claims are not actionable in Illinois absent a broader "scheme to defraud." *Gagnon* v. *Schickel*, 983 N.E.2d 1044, 1054 (Ill. App. Ct. 2012). There is no evidence of a grander "scheme" at play here. Relatedly, even if Calk unambiguously promised to "flip" Suttle's mortgage, evidence of an unfulfilled promise alone does not support a common law fraud claim. *See Greenberger* v. *GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011). Furthermore, FSB and Suttle started the process to refinance Suttle's bridge loan and obtain a traditional mortgage, but this was unsuccessful for various reasons.

Suttle has not pointed to any evidence of a fraudulent misrepresentation that would allow a reasonable jury to find in her favor. Defendants are therefore entitled to summary judgment on Suttle's fraud claim.

### C. Promissory Estoppel

Defendants again argue that Suttle cannot show that Calk or FSB made her an actionable representation. To prevail on a promissory estoppel claim in Illinois, [9] the plaintiff must ultimately prove that (1) the defendants made an unambiguous promise; (2) the plaintiff relied on the promise; (3) the plaintiff's reliance was foreseeable to the defendants; and (4) the reliance was to her detriment. *See Matthews* v. *Chi. Transit Auth.*, 51 N.E.3d 753, 780 (Ill. 2016). Additionally, the plaintiff's claim may rest on an express promise or on a promise inferred from the defendant's words and conduct. *See First Nat'l Bank* v. *Sylvester*, 544 N.E.2d 1063, 1070 (Ill. App. Ct. 1990).

Suttle's claim hinges on her assertions that Calk (1) promised her a mortgage and (2) promised to "flip" her loan into a mortgage. But neither statement can support a promissory estoppel claim. First, Suttle did obtain a loan from FSB secured by a mortgage on her home, just

---

[9] The elements are similar under Maryland law. *See Oliveira* v. *Sugarman*, 130 A.3d 1085, 1103 (Md. Ct. Spec. App. 2016).

not the kind of loan that she wanted. Second, it is also undisputed that the parties began working toward refinancing Suttle's bridge loan but never completed the process.

More to the point, these vague assertions are not the kind of "unambiguous" terms that would support a claim for promissory estoppel, which is an alternative to a breach of contract claim. *See, e.g.*, *Quake Const. Inc.* v. *Am. Airlines Inc.*, 565 N.E.2d 990, 1005 (Ill. 1990) (describing evidence of specific promise to plaintiff). Suttle has not pointed to evidence of an express promise or any words or conduct that would create a reasonable inference of a promise to provide a traditional mortgage loan. *See First Nat'l Bank*, 554 N.E.2d at 1071.

In summary, Suttle lacks sufficient evidence for a reasonable jury to find that defendants made an actionable promise. Therefore, defendants are entitled to summary judgment on Suttle's promissory estoppel claim.

## CONCLUSION

Suttle's motion for summary judgment (dkt. 109) is granted. Defendants' motion for summary judgment (dkt. 104) is denied with respect to Suttle's TILA and ICFA claims as well as FSB's counterclaim. It is granted with respect to Suttle's common law fraud and promissory estoppel claims. This case will be called for status on April 5 at 11:00 A.M. In the meantime, the parties are directed to engage in serious discussion concerning whether this case can be resolved without further litigation.

Date: March 7, 2022

U.S. District Judge Joan H. Lefkow